No. 81-550

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

LOUISE C. MARTIN,

Plaintiff and Respondent,

vs.

CROWN LIFE INSURANCE COMPANY
and MONTANA BANK OF BUTTE, N.A.,

Defendants and Appellants.

Appeal from:  District Court of the Second Judicial District,
In and for the County of Silver Bow
Honorable Arnold Olsen, Judge presiding.

Counsel of Record:

For Appellants:

Henningsen and Purcell, Butte, Montana
Mark Vucorvich argued, Butte, Montana

For Respondent:

Poore, Roth, Robischon & Robinson, Butte, Montana
Urban Roth argued, Butte, Montana

Submitted:  November 8, 1982

Decided:  February 18, 1983

Filed:  FEB 1 8 1983

*Ethel M. Harrison*
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

Crown Life Insurance Company appeals from a summary judgment of the Silver Bow County District Court which allowed Louise C. Martin to collect the difference of $60,000 between the life insurance benefit of $104,000 she had claimed and the life insurance benefit of $44,000 which the insurer, Crown Life had paid. Louise C. Martin was the beneficiary of a group life and health policy which had been provided for her husband, Daniel Martin by his employer, Montana Bank of Butte, N.A. After Daniel Martin's death, the insurer, Crown Life paid Louise C. Martin the $44,000 life insurance benefit described in the master policy. She brought this action believing she was entitled to the $104,000 life insurance benefit set out in Daniel Martin's individual certificate of insurance. Both sides moved for summary judgment. In addition to granting summary judgment in favor of Louise C. Martin for the $60,000 difference, with interest from January 29, 1979; the trial court awarded attorney fees to Louise C. Martin of 33 1/3 percent of the total recovery plus interest from the date of judgment. Crown Life appeals both the summary judgment and the award of attorney fees.

Crown Life challenges the trial court's ruling that the Crown Life master policy together with Daniel Martin's individual certificate of insurance constitute a single contract of insurance. Based on this ruling the trial court held that the differing amounts of life insurance coverage derived from those two documents created an ambiguity which should be resolved in favor of the insured, Daniel Martin and his beneficiary, Louise C. Martin. Crown Life argues that the error was clerical and should not have been resolved in favor of the insured and his beneficiary and that equity would require this Court to correct the mistake. Crown Life also claims that the trial court erred in awarding attorney fees to Louise C.

2

Martin without benefit of a specific contract provision or of statutory authority. We affirm the trial court's summary judgment that Louise C. Martin is entitled to a total life insurance benefit of $104,000, plus interest, but we reverse the award of attorney fees to Louise C. Martin.

This dispute involves the amount of life insurance coverage the insured, Daniel Martin had under a group insurance policy issued by Crown Life Insurance Company to Daniel Martin's employer, Montana Bank of Butte, N.A. In 1975, Crown Life sold a group insurance policy to the Montana Bank System which became effective January 1, 1976. As an officer of the Montana Bank of Butte from the time the Crown Life policy became effective on January 1, 1976, until his death on January 29, 1978, Daniel Martin was insured under the group policy. The plaintiff, Louise C. Martin is Daniel Martin's widow and beneficiary under the group policy.

To acquaint employees with the benefits of the group policy, Montana Bank conducted an employee meeting on December 4, 1976 which Daniel Martin attended. A brochure explaining the benefits was distributed to each employee; however, Louise C. Martin did not find such a booklet in Daniel Martin's effects after his death. The Montana Bank System paid the entire premium and the Bank's employees were not individually responsible for the payment of any premiums. Crown Life issued one master policy which was kept at Montana Bank's main office in Billings. The master policy contained a formula for calculating a bank officer's life insurance benefit by taking 300 percent of annual earnings, and rounding to the nearest thousand. There is no evidence that Daniel Martin ever went to Billings to read the master policy.

Section 33-20-1208, MCA, requires a group insurer to issue individual certificates of insurance containing certain information:

3

> "Section 33-20-1208, MCA. 'Certificate. The group life insurance policy shall contain a provision that the insurer will issue to the policyholder for delivery to each person insured an individual certificate setting forth a statement as to the insurance protection to which he is entitled, to whom the insurance benefits are payable, and the rights and conditions set forth in 33-20-1209 through 33-20-1211.'"

Based on this statute, Crown Life provided the Montana Bank with certificates of insurance to be issued to employees of the bank.

Daniel Martin received his first certificate of insurance with an effective date of January 1, 1976. The certificate did not set out the formula for calculating a bank officer's life insurance benefit. Instead, the certificate merely stated that his life insurance benefit was $42,000.

In 1977, Daniel Martin's salary increased to $14,700. Because of the salary increase, Crown Life issued Daniel Martin another certificate of insurance with an effective date of January 1, 1977. Based on the formula set forth in the master policy, the correct amount of Daniel Martin's life insurance coverage would have been $44,000. The second certificate, like the first, did not mention the formula used to compute an officer's life insurance benefit. It merely stated that Daniel Martin's life insurance benefit was $104,000. Montana Bank paid premiums to Crown Life based on the $104,000 coverage.

It is undisputed that the error on the second certificate is solely attributable to Crown Life. Both the 1976 and the 1977 certificates of insurance informed the insured that, "If you die while insured for this Benefit, the amount of life insurance shown on the FRONT PAGE of this certificate will be payable to your designated beneficiary."

Daniel Martin died on January 29, 1978. The record shows that on January 6, 1978 an employee of Montana Bank of Butte and a Crown

4

Life employee discussed the fact that Daniel Martin was overinsured. Though the Bank had been paying premiums for $104,000 worth of life insurance, the correct amount of Daniel Martin's life insurance based on his income, was $44,000. On January 10, 1978, Crown Life sent Montana Bank of Butte a corrected certificate of insurance which stated that Daniel Martin's life insurance benefit was $44,000. Crown Life failed to inform Daniel Martin of the error on his certificate of insurance before his death. On March 3, 1978, more than a month after Daniel Martin died, Vince Fisher, Montana Bank of Butte's president delivered the new, corrected certificate of insurance to Daniel Martin's widow.

Louise C. Martin accepted a payment of $44,000 from Crown Life, but reserved her right to bring an action for the $60,000 balance to which she believed she was entitled. Crown Life contends that when there is a conflict between the master policy and the certificate of insurance, the master policy controls. A provision of the master policy states that, "[i]f there is any discrepancy between the provisions of any employee's certificate and the provisions of this policy, the provisions of this policy shall govern." Crown Life also contends that even though Daniel Martin never went to Billings to read the master policy, he knew or should have known that the master policy controls because of a statement on the front of his certificate of insurance that, "[t]he insurance is subject to the terms of the group policy, and all provisions of the group policy apply to the insurance whether mentioned in this certificate or not."

It has long been the general rule that "[a] certificate issued to an employee is a part of the insurance contract under a group policy, and in case of a conflict between the terms of the certificate and the master policy, the construction which is most favorable to the employee should be adopted." Couch on Insurance 2d

5

§ 82.7. In 1942, even before the enactment of a statute requiring the issuance of individual certificates of insurance for group policies, we held that an insured had a right to rely on coverage described in a benefit certificate issued by a benefit association; and that ambiguities in the policy should be resolved against the benefit association because they are responsible for the form of the contract. McDonald v. Northern Benefit Ass'n. (1942), 113 Mont. 595, 131 P.2d 479. This principle also applies to a certificate of insurance issued by an insurance company.

In 1976, after the Montana legislature had enacted a statute requiring individual certificates of insurance for group policies, we held that the certificates of insurance are a part of the contract of insurance and that an individual insured had the right to expect the coverage described in the certificate where a change in the master policy was not reflected in the individual's certificate of insurance. Fassio v. Montana Physicians' Service (1976), 170 Mont. 320, 553 P.2d 998. We held that the insured had the right to be reimbursed for certain medical treatments which were covered by the terms of his certificate of insurance, even though a change in the master policy specified that those medical treatments would no longer be covered. The policy reasons for our holding in Fassio are equally applicable here. Because an insured under a group policy contracts only indirectly (via his employer) with the insurer, and because the certificate of insurance is the insured's primary source of information about his essential rights under the group policy, the insured should be able to rely on that certificate of insurance to correctly state the extent of his insurance coverage. Unless the certificate of insurance contains an accurate statement of coverage, the insureds and their beneficiaries would be deprived of the opportunity to supplement their coverage should they find it inadequate.

6

California has a statute similar to section 33-20-1208, MCA, requiring certificates of insurance to be provided to the group policyholder for distribution to the individual insureds. The California Supreme Court has held that the individual certificates of insurance issued pursuant to a group policy are a part of the insurance contract. Humphrey v. Equitable Life Assurance Soc. of America (Ca. 1967), 432 P.2d 746. The California court disregarded language drafted by the insurer which would have the master policy control when a conflict exists between the master policy and the certificate of insurance. We disregard similar language here. In holding that the certificate of insurance is a part of the insurance contract, the California Supreme Court reasoned that the purpose of the certificate of insurance is to:

> "provide persons insured under group policies with information regarding the coverage afforded. Obviously, only accurate information will satisfy the statutory requirement. To hold that an incorrect description of coverage is adequate would thwart the legislative purpose."
> Humphrey, 432 P.2d at 750.

The California Court noted (432 P.2d at 751) that although there are some contrary decisions the weight of authority holds that the terms of the certificate of insurance are binding on the insurer. (Citations omitted.) Based on sound policy reasons, and on McDonald and Fassio, supra, we hold that the group master policy and the certificate of insurance are elements of a single contract of insurance.

The dollar amount of Daniel Martin's insurance coverage is the essence of the policy. As an employee of the Montana Bank, Daniel Martin dealt only indirectly with Crown Life and had essentially no bargaining power. Martin and his beneficiary, Louise Martin, properly relied on his certificate of insurance to correctly state the amount of his life insurance benefit. Crown Life could easily have set out the formula for computing Martin's life insurance

7

benefit in his certificate of insurance, just as it was set out in the master policy. The formula was simple: 300 percent of the bank officer's annual income, rounded to the nearest thousand. Instead, Crown Life chose to state only the specific amount of coverage on the certificate of insurance and to remain silent as to how that amount was determined. Based on the master policy formula, Daniel Martin's life insurance benefit would have been $44,000. But his certificate of insurance stated unequivocally that he was entitled to $104,000.

Crown Life argues that the error is clerical and should not be resolved in favor of the insured. But Crown Life chose to set out a formula for calculating the benefit in the master policy and to state only the specific dollar amount of coverage in the certificate of insurance. It makes no difference whether the ambiguity was caused by design or by accident. The drafters had the opportunity to express the terms in clear unambiguous language, and could have used the same language in both the master policy and in the certificate of insurance. They must then bear the burden of the ambiguity they created. Fitzgerald v. Aetna Ins. Co. (1978), 176 Mont. 186, 577 P.2d 370. See also, Meagher v. Benefit Trust Life Insurance Company (1972), 160 Mont. 333, 502 P.2d 415.

Crown Life has also argued that equity would require this Court to reform the contract to correct the mistake. The effective date of the incorrect certificate of insurance was January 1, 1977. Daniel Martin died January 28, 1978, more than a year later. In that year, Crown Life could have corrected the mistake, but failed to do so. It was only after Martin died that the corrected certificate of insurance was delivered by the Montana Bank president to Daniel Martin's widow. Equity does not require us to reform a contract to correct an error in favor of Crown Life when due

8

diligence would have uncovered and corrected the error before Daniel Martin died.

Although we have affirmed the trial court on the insurance question, we reverse the award of attorney fees to Louise C. Martin. The general rule is that in the absence of a specific contract provision or statutory grant, the prevailing party is not entitled to an award of attorney fees either as costs of the action or as an element of damage. See McMahon v. Falls Mobile Home Center, Inc. (1977), 173 Mont. 68, 566 P.2d 75; Bitney v. School District No. 44 (1975), 167 Mont. 129, 535 P.2d 1273. Louise C. Martin does not claim attorney fees under a contract provision or a statutory right. We have on rare occasions allowed attorney fees in extreme situations without a contract provision or a statutory right. (See State ex rel. Florence-Carlton Consolidated Schools v. District Court (1981), ___ Mont. ___, 632 P.2d 318, 38 St.Rep. 1204.) This is not one of those extreme situations and we are unwilling to extend the exceptions to this well established rule. Crown Life contested and appealed this action in good faith. Louise C. Martin has prevailed on the merits, but we see no compelling reason to award her attorney fees.

Affirmed in part, reversed in part.

_____
Justice

We Concur:

_____
Chief Justice

_____

9

_Gene B. Daly_

_John C. Sheehy_

_Fred J. Weber_

_Frank B. Morrison, Jr._
Justices