CITY OF NORTHGLENN, Plaintiff,

v.

CHEVRON U.S.A., INC., Defendant.

Gerald L. GLENN and Peggy L. Glenn, Intervenors,

v.

SECURITY INSURANCE COMPANY OF HARTFORD, Transport Indemnity Company, Boulevard Insurance Services, Inc., Robert J. DeWitt, Third Party Defendants.

Civ. A. No. 81–C–44.

United States District Court, D. Colorado.

April 30, 1986.

Wiley E. Mayne, Holland & Hart, Denver, Colo., for defendant.

Paul D. Renner, Renner & Rodman, Denver, Colo., for third party defendants.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

In November 1980, gasoline leakage into sewer lines in the vicinity of a Chevron service station in Northglenn, Colorado, caused about forty-two families to be evacuated from the neighborhood. Subsequent investigation determined that the leakage had occurred from an underground line connecting the tanks to the station's gasoline dispensers. The City of Northglenn and some of its residents sued Chevron, U.S.A., Inc. (Chevron) for personal injuries and property damages caused by the gasoline leak. In June, 1981, following bifurcation of the liability and damages issues, a jury determined that Chevron was liable to the plaintiffs on the theories of negligence, trespass, nuisance, and strict liability for maintaining an ultrahazardous activity. Chevron subsequently settled 171 personal injury claims and purchased forty-two homes in the affected area.

In its amended third party complaint, Chevron contends that Transport Indemnity Company, (Transport) a third party defendant, is liable, as excess insurer, to partially reimburse Chevron approximately $1,000,000 for each of two years for amounts Chevron has paid in settlement. Chevron and Transport have filed cross motions for summary judgment. The issues presented by the respective motions are: (1) whether Chevron is named as an additional insured under the excess coverage policy issued by Transport; (2) whether Transport's liability is foreclosed because of a "pollution exclusion" provision contained in the primary insurance policy; and (3) whether Chevron gave Transport timely notice of the loss.

The parties have briefed the issues thoroughly and oral argument has been heard. Jurisdiction is based on 28 U.S.C. § 1332. The issues are ripe for decision.

Summary judgment is a drastic remedy which must be applied with caution and only after the pleadings of the party opposing the motion are liberally construed. *Tri-R Systems, Ltd. v. Friedman & Sons, Inc.*, 518 F.Supp. 1271 (D.Colo.1981). No margin or discretion exists for deciding issues of material fact on a motion for summary judgment, nor can summary judgment serve as a substitute for trial when there are disputed facts or where different ultimate inferences may be drawn from the facts. *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373 (10th Cir.1980). Summary judgment is appropriate only where the movant can clearly demonstrate that no genuine issue of material fact exists for resolution. Rule 56(c) Fed.R.Civ.P.; *Becker v. Marketing & Research Consultants, Inc.*, 526 F.Supp. 166 (D.Colo.1981); *United States v. Sante Fe Engineers, Inc.*, 515 F.Supp. 512 (D.Colo.1981). In ruling on a summary judgment motion, the court must construe all pleadings, affidavits, and admissions in favor of the non-moving party and that party must be given the benefit of all favorable inferences that can be drawn from the evidence. *Angle v. N.L.R.B.*, 683 F.2d 1296 (10th Cir.1982); *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442 (10th

Cir.1976). When a motion for summary judgment is made and properly supported, however, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but [its] response ... must set forth specific facts showing that there is a genuine issue for trial. If [the opposing party] does not so respond, summary judgment, if appropriate, shall be entered against [it]." Fed.R.Civ.P. 56(e). The mere fact that both parties argue simultaneously that there is no genuine issue of material fact does not establish that a trial is unnecessary and that the case should be disposed of by summary judgment. 10 Wright, Miller and Kane, *Federal Practice and Procedure*, § 2720 (1983). Each motion must be considered separately, and each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Id.*

## I. *Chevron as an Insured.*

The Chevron station in Northglenn was leased by Chevron to Gerald L. Glenn. Under the lease agreement, Glenn was required to obtain comprehensive general liability (CGL) insurance for certain specified perils. Glenn was also required to obtain excess CGL insurance for identical coverage in an amount of not less than one million dollars per occurrence. Glenn's primary coverage was contained in a "Garage Policy" issued by Security Insurance Group of Hartford, Connecticut. A Certificate of Insurance issued to Glenn reflects that excess CGL coverage was provided by Transport Indemnity Company. The master policy issued by Transport, effective September 1, 1979 contains the following language under the heading "Declarations":

"Item 1: Named Insured and Address: CHEVRON U.S.A., INC., ITS WHOLLY–OWNED SUBSIDIARIES AND THE INDIVIDUAL INDEPENDENT SERVICE STATION DEALER(S) THEREOF, WHO HAVE BEEN ISSUED A CERTIFICATE OF INSURANCE UNDER THE COVERAGE PROVIDED BY THIS POLICY.

c/o: Chevron U.S.A., Inc.
225 Bush Street
San Francisco, California 94104"

The endorsement to the Transport policy dated September 1, 1980 also names Chevron, U.S.A., Inc., et al., under the heading "Insured."

Based on my examination of the policy, I conclude that Chevron is named as an additional insured in the excess coverage provided by Transport. The language in the policy is clear and unambiguous. Where the terms of an insurance policy are plain and unambiguous, the court may not rewrite the policy but must enforce it as written. *Johnson v. American Family Life Assur. Co. of Columbus*, 583 F.Supp. 1450 (D.Colo.1984).

Transport cites deposition and documentary evidence, other than the policy itself, in support of its contention that the parties did not intend that Chevron be insured. Specifically, Transport contends that Chevron did not pay any premiums for individual coverage. Instead, each dealer paid separately a premium for individual coverage. This argument fails; generally, anyone may pay an insurance premium. 44 C.J.S. Insurance § 356. Moreover, it is not prerequisite to the status of being an insured that one undertake or perform a duty to pay premiums. Neither is liability for premiums necessarily predicated on the fact that the person liable procured the insurance. 6 Couch on Insurance 2d (Rev. ed) § 31:135.

Although this precise issue apparently has not been addressed by the Colorado courts (neither party has cited any pertinent Colorado case law), a similar issue was considered in *A. Copeland Enterprises v. Pickett & Meador, Inc.*, 422 So.2d 752 (Miss.1982). There, a franchise agreement required the franchisee to have Copeland, the franchisor, named as an additional insured in all its insurance policies. In holding that Copeland was not liable for the insurance premiums when the franchisee defaulted on payment, the Mississippi Supreme Court determined that there had been no promise by the additional insured

to pay the premiums, nor was there an express or implied contract between the parties. The appellate court declined to create a contract between two parties where they had not manifested a mutual assent to be bound. *Id.* at 754. See also, 14 Appleman, *Insurance Law and Practice* § 7841 (1985).

In the case at hand, the lease agreement between Chevron and Glenn required that Chevron be named as an "additional insured" in the comprehensive general liability policy obtained by Glenn. See, *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.* 569 F.2d 304, 313–314 (5th Cir.1978) (although contractual obligations regarding an insurance policy cannot ordinarily be altered by collateral agreements between the insured and third persons, the court can look to outside sources, such as lease agreements, to define the *status* of persons covered by the insurance contract). Chevron admits that it solicited and arranged for the Transport policy for its dealers in order to comply with the lease agreement. Chevron further admits that it advanced premiums to Transport for the excess policy, subject to being reimbursed by its dealers.

The initial endorsement to the Transport excess policy contained the following provision regarding payment of premiums:

"Item 5. Premium. TO BE DEVELOPED AT A RATE OF $84.00 ANNUALLY, PER INDIVIDUAL SERVICE STATION DEALER TIMES THE NUMBER OF DEALERS COVERED DURING THIS POLICY TERM, SUBJECT TO AN ANNUAL MINIMUM AND DEPOSIT PREMIUM OF $420,000.00 REGARDLESS OF THE NUMBER OF DEALERS COVERED."

The endorsement dated September 1, 1980, contained a similar provision:

"1. FOR THE PERIOD SEPTEMBER 1, 1980 TO SEPTEMBER 1, 1981 THE MINIMUM & DEPOSIT PREMIUM SHALL BE $420,000.00 SUBJECT TO ADJUSTMENT AS SET FORTH UNDER DECLARATIONS, ITEM 5."

There is no other evidence of a contract between Chevron and Transport regarding Chevron's liability for premiums under the policy. I conclude, therefore, that except for the initial premium advancement, Chevron was not contractually responsible for the payment of premiums to Transport.

 I further conclude that Chevron was an additional named insured under the clear, unambiguous terms of the excess policy issued by Transport. Neither the manner in which the premiums were paid nor to whom alters my conclusion.[1]

II. *Pollution Exclusion Clause.*

The underlying Garage Liability Insurance policy issued to Glenn was written by Security Insurance Group (Security). This underlying primary coverage was provided through three consecutive policies: No. GP26–95–41, for the period of October 29, 1978 to October 29, 1979; No. GP27–00–85, for the period of October 29, 1979 to October 29, 1980; and No. GP31–76–98, for the period of October 29, 1980 to October 29, 1981. The Security policy provides that Security "will pay all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies caused by an accident and resulting from garage operations." Within the policy, the term "accident" is defined to include "continuous or repeated exposure to the same conditions

---

**1.** Transport additionally contends that while the lease agreement named Chevron, Standard Oil Company of California and their subsidiary and affiliated companies as additional insureds, the lease specified an exception regarding "occurrences that are the result of their sole negligence." Chevron does not appear to have addressed this issue in its pleadings and briefs. Unattached documents do not control an insurer's obligation nor otherwise affect the rights of

the insured. 13A Appleman, *Insurance Law and Practice,* § 7527, p. 85 (1976). There is evidence that Transport was furnished a copy of the lease agreement prior to the issuance of the excess insurance policy. Neither party, however, contends that the lease agreement was part of, nor incorporated by reference into the terms of the Transport insurance policy. The language contained in the lease agreement does not operate as an exclusion of coverage.

resulting in bodily injury or property damage the insured neither expected nor intended." Security's policy also contains a "pollution exclusion" provision that states:

"This insurance does not apply to:

\* \* \* \* \* \*

8. Bodily injury or property damage caused by the dumping, discharge or escape of irritants, pollutants or contaminants. This exclusion does not apply if the discharge is sudden and accidental."

Transport admits that it insured Glenn under Excess Master Policy No. TEL900198, and Certificate of Insurance Nos. 02513 and 40–70467. The effective date of this insurance policy was September 1, 1979, and it provided coverage through September 1, 1980. It was renewed for the period of September 1, 1980 through February 28, 1981. Despite Transport's contention to the contrary, I find and conclude that the injury and damage claimed here by the plaintiffs, for which Chevron has paid through settlement of claims, occurred during the period for which Transport provided excess insurance coverage.

Transport admits that its policy was a "following form contract" since it provided coverage over and above the limits of the primary insurance policy issued by Security. It is undisputed that the conditions and exclusions contained in the primary policy were adopted and incorporated into Transport's excess policy.

Chevron contends that the pollution exclusion provision above set out does not foreclose Transport's obligation to indemnify it for amounts it has paid in settlement. Chevron claims that this provision applies only to acts committed by "intentional" or "active" polluters, a classification that it contends does not apply to it. In support of this argument, Chevron cites *United Pacific Ins. v. Van's Westlake Union*, 34 Wash.App. 708, 664 P.2d 1262 (1983). In that case, claimants sought damages from large quantities of gasoline, that over a period of months, leaked out of a small hole in an underground pipe at a service station. The Washington Court of Appeals affirmed the lower court's determination, on cross motions for summary judgment, that the comprehensive liability insurance policy written by United Pacific on the service station covered the claims brought by third parties. A provision in the policy under consideration in *United Pacific* defined "occurrence" in virtually the same manner as "accident" is defined in the Security policy here involved. The United Pacific policy also contained a pollution exclusion provision which excluded coverage for bodily injury or property damage

"... arising out of the discharge, dispersal, release or escape of smoke, vapors, ... toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, ... unless such discharge, dispersal, release or escape is sudden or accidental."

The appellate court noted that the language of the pollution exclusion provision had almost unanimously been held to be ambiguous. 664 P.2d at 1265. After examining the intention of the underwriters, the court construed the provision against the insurer and in favor of the insured, concluding that it was meant solely to exclude active pollution from coverage. Courts in other jurisdictions have reached the same conclusion when construing similar policy provisions. *See, e.g., Molton, Allen & Williams, Inc., v. St. Paul Fire & Marine Ins. Co.*, 347 So.2d 95, 99 (Ala. 1977); *Niagara County v. Utica Mut. Ins. Co.*, 103 Misc.2d 814, 427 N.Y.S.2d 171 (N.Y.Sup.Ct.1980), aff'd 80 A.D.2d 415, 439 N.Y.S.2d 538 (1981). Apparently no Colorado state court opinion has considered this issue.[2]

Chevron argues that the pollution exclusion provision does not exclude coverage for pollution damage which was neither intended nor expected by the insured. Chevron further contends that because pre-

---

**2.** Several cases from state jurisdictions have considered this issue and are discussed in *Jack-son TP., etc. v. Hartford Acc. & Indem.*, 186 N.J.Super. 156, 451 A.2d 990 (1982).

vious case law has so interpreted the pollution exclusion provision, Transport, and the insurance industry generally, were on notice regarding the provision's application to losses such as that here at issue. No Colorado case law is cited in support of this argument.

In response, Transport contends that the decision rendered by the Washington Court of Appeals is not controlling on this issue. Rather, Transport maintains that under Colorado law, the intention of the parties is paramount when construing the terms of an insurance policy. Transport argues that the evidence in the record indicates that the parties intended and understood that losses caused by gradual seepage and pollution were excluded from coverage under the policy.

■■ I have previously determined that, as to multiple risk casualty insurance contracts, the law that governs an insurer's duties is the law of the state where the occurrence giving rise to the claim took place. See, Order entered March 29, 1985. Thus, Colorado law is to be applied here.

■■ Under Colorado law, insurance contracts are construed according to the general rules of construction applicable to contracts and according to the intent of the parties. *Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 289 (Colo.1982). The intent of the parties is determined by the contract language itself. Only if the terms of the agreement are ambiguous does extrinsic evidence become relevant. A mere disagreement between the parties as to the interpretation of the agreement will not in itself create an ambiguity as a matter of law. *Benham v. Manufacturers & Wholesalers Indem.*, 685 P.2d 249, 253 (Colo.App. 1984), citing *Union Rural Electric Ass'n v. Public Utilities Commission*, 661 P.2d 247 (Colo.1983).

If the terms of the insurance contract are plain and unambiguous, the contract may not be rewritten by the court, nor may its effect be limited. *Gulf Ins. v. State*, 43 Colo.App. 360, 607 P.2d 1016 (1979). Neither may the court force an ambiguity in

order to resolve it against an insurer. *Martinez v. Hawkeye-Security Ins. Co.*, 195 Colo. 184, 576 P.2d 1017 (1978). The interpretation of an insurance policy is a matter of law to be determined by the court. *Ohio Casualty Ins. Co. v. Guaranty Nat. Ins. Co.*, 197 Colo. 264, 592 P.2d 397 (1979).

Both parties appear to agree that the cause of the injuries and damages sustained here was the gradual seepage of gasoline which permeated the soil and ground water and entered the sewer line in the vicinity of the service station. The primary insurance policy defines "accident" as including continuing conditions. The policy excludes coverage, however, for the escape of pollutants unless they escape suddenly and accidentally. I conclude that because of these apparently conflicting provisions, the language employed in the policy is ambiguous. *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690 (10th Cir. 1981) (if policy provisions will support two meanings, one favorable to the insured and the other favorable to the insurer, the language is ambiguous).

Under Colorado law, I must examine evidence as to the parties' intent before applying a rule of construction which requires resolving ambiguous provisions against the insurer, who drafted them, and in favor of the insured. *Security Mut. Cas. Co. v. Century Cas. Co.*, 531 F.2d 974, 976 (10th Cir.1976), *cert. denied* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137; *Quad Constr., Inc. v. William A. Smith Contracting Co., Inc.*, 534 F.2d 1391 (10th Cir.1976). In order to ascertain intent, the court must place itself in the position of the parties at the time the policy was executed and consider from that point of view the circumstances surrounding its execution, together with the instrument itself. *Acampora v. Birkland*, 220 F.Supp. 527 (D.Colo.1963).

Critical to the issue of intent is the deposition evidence supplied by Euclid G.H. Black, a surplus line insurance broker and principal in the firm of Black, White and Associates of San Francisco, California. In 1979, Black was asked by Healy Insurance

Marketing Services, Chevron's main insurance broker, to assist Healy in placing for Chevron insurance coverage in excess of the standard coverage its dealers purchased from local agents. Transport characterizes Black as the key underwriter of the policy on behalf of Chevron. Black testified in his deposition that there were discussions with persons, including representatives of Chevron, that the standard comprehensive general liability policy contained an exclusion for loss caused by gradual seepage and pollution. Since the Transport policy was a following form policy, Black's testimony indicates that Chevron understood it would have no coverage for this peril. Black stated that it was "inconceivable" and "ludicrous" for Chevron to take the position that it did not understand that there was no coverage for gradual seepage and pollution.

Other evidence in the record tends to confirm Black's position. Marley Darneal, senior insurance analyst for Standard Oil Company of California, the parent company of Chevron, U.S.A., testified in his deposition that the pollution exclusion clause in the standard policy was a mere boilerplate exclusion. According to Darneal's own construction of the policy, he never expected Chevron to have coverage for gradual seepage. Other documents in the record reflect, however, that in July, 1983, Darneal represented to Chevron's dealers that a unique insurance protection program had been obtained which for the first time made available coverage for gradual seepage and pollution.

Finally, William Beaton, Vice President of Healy Insurance Marketing Services, testified that he and Darneal discussed the prospect of coverage under the policy after they learned that Chevron was proceeding against Transport. According to Beaton, both he and Darneal believed that it was not the intention of the policy to cover losses due to gradual seepage and pollution.

Chevron in response contends that neither Darneal, Beaton nor Black discussed coverage under the pollution exclusion clause at the time the policy was executed. Although the evidence in support of Chevron's position is scant, Darneal did testify that he could not recall having discussed the pollution exclusion clause prior to 1981. Beaton also stated that he did not recall having discussed anything specific on this issue with Darneal in 1979. Chevron emphasizes that there is no evidence regarding whether Transport intended coverage to exist and thus, the mutual intent of the parties is not established by the evidence on file in the record. Chevron argues that since Security provided a defense to Glenn under its policy, I must infer that Security believed that coverage existed and must apply that inference to Transport.

Under the circumstances of this case, I conclude that the facts are in dispute on whether the parties intended coverage to exist under the pollution exclusion provision. Absent evidence and resulting inferences which are uncontroverted, the question of the intent of the parties in the interpretation of a contract becomes one of fact to be resolved by the trier of fact. *Beneficial Finance Co. of Colorado v. Bach*, 665 P.2d 1034 (Colo.App.1983).

Chevron raises one additional argument. Chevron contends that it has paid claims to the plaintiffs for injuries due to the risk of explosion from the leaked gasoline. Referring to the lease agreement with Glenn, Chevron claims that the parties intended for the primary and excess insurance to provide coverage for "explosion hazard" and thus, that Chevron should be indemnified. (Chevron relies on the jury's specific finding that Chevron was liable for maintaining an ultrahazardous or abnormally dangerous activity.)

Neither party, however, has cited any relevant policy provision that provides coverage for "explosion hazard." A lease agreement is not a policy of insurance. I cannot accept Chevron's argument on this point.

Because the material facts are in dispute on the material issue of the parties' intent, summary judgment on this ground is denied.

### III. *Notice of Loss.*

The endorsement dated September 1, 1980, attached to the master excess coverage policy issued By Transport, contains the following language regarding notice of loss:

"NOTICE OF LOSS. Whenever the insured has information from which the insured may reasonably conclude that an occurrence covered under this policy involves injuries or damages which in the event that the insured should be liable, are likely to involve this policy, notice shall be sent to the Company as soon as practicable, provided, however, that failure to give notice of any occurrence, which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims under this policy, shall not prejudice such claims."

On April 14, 1981, the attorney then representing Gerald and Peggy Glenn sent written notification to Healy Insurance Marketing indicating that the Glenns had intervened in the instant litigation. With that correspondence was a copy of the Answer and Counterclaim filed by Chevron against the Glenns. The correspondence requested that the Transport Indemnity Company Claims Department be advised of the pending litigation. On April 16, 1981, David Healy forwarded this correspondence to Euclid G.H. Black.

Chevron contends that this procedure satisfied the notice provision in the Transport policy. In support, Chevron refers to the Certificate of Insurance issued to Gerald L. Glenn certifying that excess liability coverage had been placed with Transport Indemnity Company under Master Policy TEL 900198, effective September 1, 1980. That Certificate provided:

"CLAIMS NOTICE:

Regardless of any question of liability, please tell your primary insurance carrier when you give them notice of a possible claim, to advise the TRANSPORT INDEMNITY COMPANY Claims Department of any occurrence where serious injuries are involved such as but not limited to brain injuries, spinal cord damage or paralysis, dismemberment, extensive disabling or disfiguring burns and cases involving death.

Also have them report any summons and complaint with open damage demands or specified damage demands which exceed their limits of liability.

Please direct such notice to Healy Insurance Marketing Services, P.O. Box 27603, San Francisco, CA 94127."

Chevron claims that written notice to the insurer given by a named insured is sufficient notice on behalf of any additional insureds, citing two cases from other jurisdictions. Chevron further contends that pursuant to the cited provision in the Certificate of Insurance, Healy Insurance Marketing Services acted as agent for Transport for purposes of receiving notice of loss.

Transport disputes Chevron's contention, claiming that it was neither properly nor timely notified. Transport alleges that it first received written notice of the Chevron counterclaim against the Glenns on January 8, 1982. On that date, Transport received a copy of a letter forwarded by Healy Insurance Marketing Services. Healy had received this letter from the Glenn's attorney, and it mentioned the Chevron counterclaim. This latter correspondence was dated December 21, 1981. Transport contends that it was not placed on notice regarding any lawsuits against Chevron until January 24, 1983, when it was served with process making it a third party defendant. Finally, Transport denies that Healy was its designated agent for purposes of receiving notice of claims. Instead, Transport contends that both Healy and Black were insurance brokers solicited by Chevron to obtain excess liability coverage for it and, as such, they were Chevron's agents.

At oral argument on the motions, Chevron asserted that Glenn was not provided a copy of Transport's Master Policy. Glenn received instead a Certificate of Insurance from Transport evidencing the excess liabil-

ity coverage. Transport does not dispute Chevron's assertion.

■ It appears to me that the notice provision in the Master Policy is in conflict with the notice provision contained in the Certificate issued to Glenn. It has been recognized that where the certificate refers to the main policy by number, as is the case here, the two documents must be construed together to determine the meaning and effect of the policy. If there is a conflict between the provisions contained in the master policy and the certificate, the certificate controls. In such cases, it is especially significant that the party claiming coverage did not receive a copy of the master policy but instead was furnished only the certificate. *J.M. Corbett Co. v. Insurance Co. of North America,* 43 Ill. App.3d 624, 2 Ill.Dec. 148, 357 N.E.2d 125 (1976); *Fagan v. John Hancock Mutual Life Ins. Co.,* 200 F.Supp. 142 (D.Kansas 1961) (construing Illinois law in an action brought by beneficiaries under a group policy which was in conflict with the individual certificate, the certificate was held to control). This principle has been recognized in form in Colorado. *Binkley v. Manufacturers Life Ins. Co.,* 471 F.2d 889 (10th Cir. 1973) reh'g. denied (if terms of individual policy (certificate of insurance) differ from terms of the group policy, then individual policy is separate and distinct from the group policy regarding conflicting provisions contained in them).

■ Although there appears to be no Colorado case on point, persuasive authority indicates that when notice of an accident is received by the insurer, that notice is regarded as if given on or behalf of all parties in interest. 8 Appleman, *Insurance Law and Practice* § 4738. See also, *Monguso v. Pietrucha,* 87 N.J.Super. 492, 210 A.2d 81 (1965) (persuasive authority cited); *Royal Indemnity Co. v. Pearson,* 246 So.2d 652 (Ala.1971).

■ It is undisputed that Glenn, pursuant to the terms of the Certificate of Insurance issued to him by Transport, forwarded notice of the claimed loss to Healy Insurance Marketing Services. I conclude as a matter of law, that Glenn's notice to Healy applied to Chevron's benefit as well. Resolution of this issue, however, does not end the dispute.

■ Chevron solicited the excess insurance coverage at issue through Healy Insurance Marketing Services. Pursuant to Col.Rev.Stat. § 10–2–203(2) (Cum.Supp. 1984), Healy represented the *insured* and not the *insurer* when he, in turn, sought excess coverage on behalf of Chevron. Section 10–2–203(2) provides:

"Every insurance broker or surplus line insurance broker who solicits an application for insurance of any kind shall be regarded as representing the insured or his beneficiary and not the insurer in any controversy between the insured or his beneficiary and the insurer issuing any policy upon such application;...."

Generally, in various phases of conducting business, one who is an insurance broker may also act as an agent. Thus, an insurance broker first employed by one party may, as negotiations progress, become the agent of the other. For example, an insurance broker acts for the *insured* for the purpose of making the application and procuring the policy. The broker, however, acts on behalf of the *insurer* when collecting and remitting premiums and delivering the policy. 3 Couch on Insurance 2d (Rev ed) § 25:94. See also, 16 Appleman, *Insurance Law and Practice* § 8736. The concept of dual agency in the insurance industry has been recognized in Colorado as neither unethical nor unusual. *Dailey v. Elicker,* 447 F.Supp. 436 (D.Colo. 1978). Ordinarily, whether a broker is agent for the insured or the insurer is a question of fact to be resolved by the trier of fact when there is conflicting evidence. 8 Couch on Insurance 2d (Rev ed) § 25:94. See, generally, *Dailey v. Elicker,* 447 F.Supp. at 439 (existence of a particular agency relationship is generally a question of fact).

Because Transport unequivocally denies that Healy was its agent for purposes of receiving notice under the Transport excess

policy, the material facts on this issue are in dispute. The jury must determine, upon evidence presented by the parties, whether Healy was acting as Transport's agent when it received notice of loss forwarded by Glenn.

Neither party is entitled to summary judgment. Both motions for summary judgment are denied.