**Andrea L. HOLDRIDGE, Plaintiff,**

v.

**BCS LIFE INSURANCE COMPANY, an Illinois corporation, d/b/a BCS Life, Inc., and Blue Cross/Blue Shield of Maryland, Inc., a Maryland corporation, Defendants.**

Civ. A. No. 92–F–2268.

United States District Court,
D. Colorado.

Feb. 18, 1994.

James M. Edwards, Steven A. Shapiro, Harding & Ogborn, Timothy J. Lamb, Timothy J. Lamb, P.C., Denver, CO, for plaintiff.

Dean A. McConnell, Cooper & Kelley, P.C., Denver, CO, for defendants.

## ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT

SHERMAN G. FINESILVER, Chief Judge.

This case involves claims against an insurance company that refused coverage for what it considered to be Plaintiff's pre-existing condition. Jurisdiction is based on 28 U.S.C. §§ 1332, 1441, and 1445. The action was initially brought in state court and was removed by the Defendants. This matter comes before the Court on Plaintiff's *Motion For Partial Summary Judgment* and Defendants' *Motion For Summary Judgment.*

### I. BACKGROUND [1]

Plaintiff, Andrea Holdridge, was a thirty-three year old student at the University of Colorado, enrolled for the summer session beginning June 4, 1990. She paid full tuition and fees for the semester, but did not pay for health insurance at the beginning of the term. In late June, Plaintiff had a sore throat and other symptoms which were diagnosed as laryngitis or pharyngitis. On July 9 and 10, Plaintiff was examined by two eye doctors and saw two doctors at Wardenburg Student Health Service on campus (Wardenburg). Various tests were ordered on the 9th and 10th, but only a chest X-ray was taken. On the morning of July 11, Plaintiff returned to Wardenburg for the tests ordered the previous day by Dr. Mark Frank. Plaintiff had a complete blood test taken. Dr. Frank found highly elevated levels of white blood cells, and told Plaintiff that she should go to the hospital, and that she was quite ill. The parties dispute whether or not the doctor mentioned the possibility of leukemia. Plaintiff's mother, Eve Holdridge, who worked at Wardenburg and was present that day, discovered that her daughter had no health insurance, and immediately bought insurance for the summer session, costing $153.00. The parties also dispute whether the person who sold Plaintiff's mother the insurance policy told her of a "pre-existing

---

**1.** The facts recited herein are taken from the parties' pleadings.

condition" exclusion and its possible applicability to Plaintiff's situation.

Plaintiff was diagnosed the next day, July 12, 1990, with acute myelogenous leukemia, and underwent extensive treatment. Prudential Insurance, the primary insurance carrier used by the university, paid up to its limit of $20,000. BCS Life Insurance Company and Blue Cross/Blue Shield of Maryland, Inc., the catastrophic plan providers and administrators, refused claims on the basis that Plaintiff had a pre-existing condition at the time her policy became effective. Medicaid paid Plaintiff's medical bills and has a statutory lien of approximately $208,000.00. Plaintiff seeks a declaratory judgment on the policy, breach of contract damages in the amount of the difference between what the policy would have paid and what Medicaid paid, and tort damages for bad faith breach of an insurance contract.

The main issues to be considered in conjunction with the parties' motions for summary judgment are: 1) the effective date of the policy; 2) which policy statement controls the insurance contract, the booklet issued by the University of Colorado to students, or the "Master Policy" on file in the Chicago offices of the Plan administrator; and 3) whether Plaintiff had a "pre-existing condition" within the meaning of the Policy as of its effective date.

## II. STANDARD

Granting summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1534 (10th Cir.1993); *Ash Creek Mining Co. v. Lujan*, 934 F.2d 240, 242 (10th Cir.1991); *Metz v. United States*, 933 F.2d 802, 804 (10th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991); *Continental Casualty Co. v. P.D.C., Inc.*, 931 F.2d 1429, 1430 (10th Cir.1991). A genuine issue of material fact exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Merrick v. Northern Natural Gas Co.*, 911 F.2d 426, 429 (10th Cir.1990). Only disputes over facts that

might affect the outcome of the case will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Fostved v. United States, I.R.S.*, 824 F.Supp. 978, 982 (D.Colo.1993). In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the party opposing the motion. *Concrete Workers v. City and County of Denver*, 823 F.Supp. 821, 828 (D.Colo.1993). All doubts must be resolved in favor of the existence of triable issues of fact. *Boren v. Southwestern Bell Tel. Co.*, 933 F.2d 891, 892 (10th Cir.1991); *Mountain Fuel Supply v. Reliance Ins. Co.*, 933 F.2d 882, 889 (10th Cir.1991).

In a motion for summary judgment, the moving party's initial burden is slight. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986), the Supreme Court held that the language of rule 56(c) does not require the moving party to show an absence of issues of material fact in order to be awarded summary judgment. Rule 56 does not require the movant to negate the opponent's claim. *Id.* at 323, 106 S.Ct. at 2553. The moving party must allege an absence of evidence to support the opposing party's case and identify supporting portions of the record. *Id.*

Once the movant has made an initial showing, the burden of going forward shifts to the opposing party. The nonmovant must establish that there are issues of material fact to be determined. *Id.* at 322–23, 106 S.Ct. at 2552–53. The nonmovant must go beyond the pleadings and designate specific facts showing genuine issues for trial on every element challenged by the motion. *Tillett v. Lujan*, 931 F.2d 636, 639 (10th Cir. 1991). Conclusory allegations will not establish issues of fact sufficient to defeat summary judgment. *McVay v. Western Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir. 1987).

In reviewing the evidence submitted, the court should grant summary judgment only when there is clearly no issue of material fact remaining. In *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11, the Court held that

summary judgment should be granted if the pretrial evidence is merely colorable or is not significantly probative. In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Court held that summary judgment is appropriate when the trial judge can conclude that no reasonable trier of fact could find for the nonmovant on the basis of evidence presented in the motion and the response. *Id.* at 587, 106 S.Ct. at 1356.

### III. ANALYSIS

#### A. *The effective date of the policy.*

■ Plaintiff contends that the effective date of the insurance policy was June 4, 1990, which was the first day of the summer session. Defendants insist that the policy only was effective as of July 11, 1990, the date Plaintiff bought her policy. Plaintiff otherwise contends that the contract is ambiguous as to the effective date and thus should be construed against the insurer to make the effective date June 4, 1990. "Under Colorado law, insurance contracts are construed according to the general rules of construction applicable to contracts and according to the intent of the parties." *City of Northglenn v. Chevron U.S.A., Inc.*, 634 F.Supp. 217, 222 (D.Colo.1986), *citing Marez v. Dairyland Ins. Co.*, 638 P.2d 286, 289 (Colo.1982). "The intent of the parties is determined by the contract language itself. Only if the terms of the agreement are ambiguous does extrinsic evidence become relevant." *Id.* at 222.

The Booklet issued by the University of Colorado is not specific as to the procedure for and effect of purchasing health insurance solely for the summer session.[2] The Booklet provides for a two-week period at the beginning of the fall and spring semesters during which students can purchase or waive insurance. Defendants thus contend that there were only two enrollment periods for student health insurance, in the fall and spring semesters. This argument is contrary to the

evidence. The Booklet laid out specific enrollment periods for the fall and spring semesters, and seemingly intended to have such a time period for the summer session as well, according to language in the Booklet and the deposition testimony of Stephen Beckley, a health plan administrator. A limited enrollment period for the summer was not, however, established. Administrators Stephen Beckley and Barbara Batt testified that students were apparently entitled, to the administrators' chagrin, to enroll throughout the summer session. Mr. Beckley testified in his deposition that the school "had apparently allowed the open enrollment termination date to fall out of the text of the brochure some years earlier." He also indicated that if the school had been consistent with its objective regarding fall and spring enrollment, "we would have had a two to three-week period for students to enroll in the plan at the beginning of the summer and not allowed open enrollment throughout the summer."

For the fall and spring semesters, the effective date of coverage, as long as insurance was purchased within the enrollment/waiver period, was the first day of the semester. The only exception occurred when a student was allowed to enroll outside the enrollment period because of the involuntary loss of other insurance coverage. In such a case, the effective date of coverage was the date the student paid rather than (retroactively) the first day of the semester. Defendants argue that by allowing Plaintiff to enroll outside the enrollment period, the university waived its right to demand proof that other insurance had been canceled, but that the portion of this exception setting the effective date as the date of payment remains in force. Plaintiff contends that this exception does not apply, for two reasons. First, she argues that Plaintiff was not purchasing insurance because of a loss of other insurance. Second, she argues that the entire summer session was an open enrollment period, and

---

**2.** The effective date for coverage under the catastrophic plan will be determined by reference to the provisions for primary plan coverage, as enrollment in the former is automatic when one enrolls in the primary plan. Additionally, the language in the Booklet regarding the "cata-

strophic plan year" is circular and provides little guidance. It reads: "The Catastrophic Plan Year is the day when your coverage becomes effective and continues until August 18th. The effective date of your coverage will be the first day of the Catastrophic Plan Year."

thus she could not have been buying insurance outside of a limited enrollment period.

In the fall of 1989, Plaintiff filled out a waiver of insurance form, indicating that she did not wish to purchase insurance. Defendants argue that the waiver applied up to the day Plaintiff bought insurance, and thus her insurance was effective only as of that date. The Booklet does not indicate whether or not a waiver executed in the fall semester carries through all year. Defendants contend that language in the Booklet regarding automatic enrollment in the health plan if no waiver is submitted bolsters their contention that there were two enrollment/waiver periods only, and that Plaintiff's fall 1989 waiver lasted at least until she purchased insurance.

■ It appears from both the Booklet and the university's practice that a person buying summer insurance could do so at any time, as no specific enrollment period is set forth as it is for the fall and spring sessions. The fact that no other proviso for an effective date is set forth leads to various possible interpretations. The question is which interpretation prevails. A determination of the existence of ambiguities in a contract is a question of law, "and the court must examine the insurance policy as a whole in making this determination." *Farmers Insurance Co. v. Plunkett*, 687 P.2d 470, 472 (Colo.1984). Of course, "[p]olicy provisions should be read to avoid ambiguities if possible, and the language should not be tortured to create ambiguities." *Wota v. Blue Cross and Blue Shield of Colorado*, 831 P.2d 1307, 1309 (Colo.1992). On the other hand, when provisions are plainly contradictory or when a word or phrase is reasonably susceptible to more than one construction—and if each of the competing interpretations is objectively reasonable, it is clear that an ambiguity exists. *See City Of Northglenn*, 634 F.Supp. at 222 ("if policy provisions will support two meanings, one favorable to the insured and the other favorable to the insurer, the language is ambiguous") (citing *Harrison Western Corp. v. Gulf Oil Co.*, 662 F.2d 690 (10th Cir.1981)).

The question presented is whether and how the summer session should be considered in relation to the fall and spring semesters. Arguably, the entire summer session is analogous to the specified enrollment/waiver period of the fall and spring. Or, the summer session could have an implied limit similar to the other semesters, so that although the school allowed students to sign up at any time, the effective date was considered the purchase date since a sign-up could take place after the "cutoff" date. University records show the effective date of summer insurance for various students in the summer of 1989, including Plaintiff, was considered to be the date of payment. The summer session in other ways cannot be analogized to the spring and fall at all. For example, if a student purchased insurance for the spring, she would automatically be covered throughout the summer. If, then, a student's waiver in the fall lasted through the spring, it might well continue through the summer. Thus, the summer session could be viewed either as an extension of the spring semester or as a unique, discrete unit. The failure to provide detailed provisions for the purchase of summer-only insurance reflects this confusion.

Obviously, the intent of the parties differs in how they view the provisions in the Booklet pertaining to the effective date of summer session coverage. When Plaintiff bought her insurance, she intended to have coverage that was as broad as possible; Defendants wished to limit their liability within the parameters created by the Booklet and the Master Policy. Defendants' records indicate an effective date reflecting the date of purchase. Defendants contend that the purpose of insurance is that buyers should bear some risk, and should not be allowed to buy insurance once they already know they will need it. Defendants state that Plaintiff should not be allowed to take advantage of the ambiguity created by the lack of a clear provision for an effective date to defeat the purpose of an insurance policy. As the evidence and any inferences to be drawn from it remain controverted, the issue of an effective date is one that must be resolved by the trier of fact. *City of Northglenn*, 634 F.Supp. at 223. More evidence is required before such a determination can be made.

B. *Which policy statement controls.*

■ Plaintiff contends that the Booklet issued by the university to students and the

Master Policy must be read together to determine the terms of insurance coverage. She argues that the definition of the exclusion for "pre-existing conditions" contained in each document is different, thus creating an ambiguity that should be resolved in favor of Plaintiff to provide the broadest coverage. Defendants initially contended that the Policy Booklet issued to students by the Wardenburg Student Health Center is only an explanatory pamphlet and that the Master Policy administered by the American College Health Association and retained at the organization's headquarters in Chicago is controlling. Defendants, however, have also argued that which written statement controls does not matter, as either way the result is the same, and Plaintiff's illness is not coverable.

The Court disagrees with Defendants that the definitions of pre-existing condition contained in these documents are the same. In Section II of the Booklet, describing the catastrophic plan, a pre-existing condition is defined as "an injury and/or illness for which you were medically treated, or advised by a Practitioner, prior to the effective date of your Catastrophic Plan." In the Master Policy, a pre-existing condition is defined as "1. an injury sustained; or 2. an Illness that a Member was medically treated or advised by a Practitioner, *or for which symptoms were present* ..." (emphasis added). In this instance, the two provisions are not completely contradictory. The addition in the Master Policy of language relating to the manifestation of symptoms, however, makes the definition more restrictive than that contained in the Booklet. Plaintiff's contention that this renders the language conflicting and ambiguous is persuasive. "[A]mbiguous provisions are to be construed against the drafter and in favor of providing coverage." *Omnibank Parker Road, N.A. v. Employers Insurance of Wausau,* 961 F.2d 1521, 1523 (10th Cir. 1992).

In our view, the better view is that the Master Policy and the Booklet issued to the insured together constitute the insurance agreement. *See Davis v. Crown Life Ins. Co.,* 696 F.2d 1343 (11th Cir.1983) (citing Florida cases); *Morris v. Travelers Ins. Co.,* 546 S.W.2d 477 (Mo.Ct.App.1976); *Martin v.*

*Crown Life Ins. Co.,* 202 Mont. 461, 658 P.2d 1099 (1983) (construing group master policy and certificate of insurance as elements of a single contract); *Van Vactor v. Blue Cross Ass'n,* 50 Ill.App.3d 709, 8 Ill.Dec. 400, 365 N.E.2d 638 (1977) (significant policy exclusions contained in a master contract but omitted from brochure distributed to policy holders should not be enforced); *Humphrey v. Equitable Life Assurance Soc. of Am.,* 67 Cal.2d 527, 63 Cal.Rptr. 50, 432 P.2d 746 (1967) (under statute requiring individual certificate showing coverage, certificate is binding on insurer, and "[t]his result is easily justified upon the grounds that the individual certificate is the only document which the employee sees or is given at any time and that the insurer, who drafts the instrument in language it selects, cannot thereafter complain that it does not express the intention of the parties."); *See generally* 13A Appleman, INSURANCE LAW AND PRACTICE, § 7528 (1976 & Supp.1993).

Barbara Batt testified at her deposition that she relied on the Booklet rather than the Master Policy to determine the definition of pre-existing condition. Regarding the preparation of the Booklet, Stephen Beckley testified that the provisions in the catastrophic portion of the policy were at least initially drafted by the company, and that "the insurance company ultimately sign[ed] off on the language and g[ave] their full approval of the text." The Booklet states, regarding the catastrophic coverage, that the Booklet "contains only a summary of the essential benefits and provisions of the" plan, and that the "Policy is available for your review at your school's health service office." The evidence is clear that there was no copy of the Master Policy on file at the university health center.

Unless Plaintiff had access to the Policy, both she and the insurer should be bound by the term as defined in the Booklet provided her. "The drafters had the opportunity to express the terms in clear unambiguous language, and could have used the same language in both the master policy and in the certificate of insurance. They must bear the burden of the ambiguity they created." *Martin,* 658 P.2d at 1103. *See generally* 1

Appleman, INSURANCE LAW AND PRACTICE, § 46 ("Certificate as Controlling"). As the provisions vary significantly, the provision in the Booklet, which is broader, should prevail. *See Evans v. Lincoln Income Life Ins. Co.,* 585 P.2d 407 (Okla.Ct.App.1978); *see also City of Northglenn,* 634 F.Supp. at 222.

### C. *Did Plaintiff have a "pre-existing condition".*

 The final issue for the Court is whether Plaintiff had a pre-existing condition as of the effective date of her insurance, so as to exclude coverage. At the outset, the Court notes that the burden is on the insurer to establish that an exclusion applies, and that the exclusion is not subject to any other reasonable interpretations. *Omnibank Parker Road, N.A. v. Employers Insurance of Wausau,* 961 F.2d 1521 (10th Cir.1992). The definition of pre-existing condition the Court is concerned with is that contained in the Booklet: an injury and/or illness for which Plaintiff was "medically treated[,] or advised by a Practitioner, prior to the effective date of" her coverage.

Plaintiff received treatment on June 22, 1990 for what was perceived as laryngitis/pharyngitis, and she later refilled her prescription for antibiotics at Boulder Community Hospital. Plaintiff was seen again by various doctors on July 9 and July 10, 1990, for eye problems and because of the continuation of symptoms previously thought to relate to her laryngitis. Defendants state that unanimous testimony indicates that Plaintiff was suffering leukemia as of June 4, 1990, the first day of the summer session. Plaintiff's deposition testimony claims that she was not ill as of that date. The Court notes that the record reflects that Plaintiff self-medicated with antibiotics prior to June 22. Also, Plaintiff's doctors have testified that the average length of time a patient has leukemia prior to the time she is diagnosed is six weeks. Plaintiff contends that it is irrelevant that her doctors now believe that when she was diagnosed with and treated for laryngitis she actually had symptoms of her later-diagnosed leukemia. She argues that this represents twenty-twenty hindsight. Defendants contend that the fact that it later became evident that Plaintiff was suffering from leukemia prior to the July 11 or 12 diagnosis is highly relevant, as it proves that Plaintiff's condition was manifest prior to the time her insurance became effective.

The issue of when Plaintiff's coverage became effective remains unresolved. The evidentiary documents submitted with the parties' motions disclose various disputed material facts relating to whether Plaintiff suffered from a pre-existing condition, including, most fundamentally, whether she was in fact "treated for" or "received advice" relating to her condition prior to the effective date of coverage, which has not yet been determined. Therefore, a grant of summary judgment is precluded, and the question of whether the pre-existing condition exclusion contained in the Booklet excludes coverage of Plaintiff's treatment for leukemia remains for the jury. *See City of Northglenn,* 634 F.Supp. at 223.

### IV. ORDER

Accordingly, it is hereby ORDERED that:

(1) Plaintiff's *Motion For Partial Summary Judgment* is GRANTED IN PART and DENIED IN PART;

(2) Plaintiff's motion is DENIED insofar as it seeks a determination that the effective date of Plaintiff's catastrophic insurance coverage was June 4, 1990;

(3) Plaintiff's motion is GRANTED insofar as the Court finds that the Policy Booklet definition of "pre-existing condition" controls over the definition contained in the Master Policy;

(4) Plaintiff's motion is DENIED insofar as it seeks a determination of whether Plaintiff received treatment or advice for a "pre-existing condition" prior to the effective date of coverage; and

(5) Defendants' *Motion For Summary Judgment* is DENIED.