Larry LASTER, Plaintiff,

v.

AMERICAN NATIONAL FIRE
INSURANCE COMPANY,
Defendant.

No. Civ. A. 4–90–234–A.

United States District Court,
N.D. Texas,
Fort Worth Division.

Oct. 17, 1991.

986

H.G. Wells, Wells, Williford & Felber, Fort Worth, Tex., for plaintiff.

Richard Brent Cooper, Charles Thomas Frazier, Jr., Cowles & Thompson, Dallas, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

McBRYDE, District Judge.

Came on to be considered the motion of defendant, American National Fire Insurance Company ("American"), for summary judgment. On the basis of the summary judgment record, including the facts that are set forth under the heading "Facts Established by Pleadings, Stipulation or by Admission" in the pretrial order signed by the court October 7, 1991, the court has concluded that American's motion should be granted.

*Nature of the Litigation as Established by Undisputed Summary Judgment Evidence*

This is a diversity action. Texas substantive law governs. In October 1986

Larry Laster ("Laster"), plaintiff in this action, filed an action in a state district court against Steve Warren ("Warren") in which he contended that in September 1983 he was injured as a result of having been struck by a swinging chute of a concrete truck owned by Inter County Concrete, Inc. ("Inter County") that was being operated by Warren for, and while he was in the course and scope of employment of, Inter County. At the time of the alleged accident, Inter County had its primary motor vehicle liability insurance coverage with Transit Casualty Company ("Transit") through an insurance policy that provided liability insurance coverage in the amount of $1,000,000.00 for each occurrence. In December 1986, Transit was found by order of a state district court of Travis County, Texas, to be insolvent; and, by the same order, the Liquidator for the State Board of Insurance for the State of Texas was appointed permanent ancillary receiver for Transit. American had issued an excess liability insurance policy to Inter County, as the named insured, with a policy period from March 1, 1983, to March 1, 1984. As a permissive user of the concrete truck, Warren was an additional insured under both the Transit policy and the American policy.

In February 1987 Warren, acting through attorney G. Craig Hubble ("Hubble"), advised American for the first time of the Laster claim and of the pendency of the damage suit. At the same time, he asked American to provide him a defense in the suit. Inter County was named as a defendant along with Warren. American offered to provide a defense to Warren and Inter County, but only on condition that they agree that by doing so it would not waive its right to maintain that it would not be obligated to pay the first $1,000,-000.00 of any recovery made by Laster. Inter County accepted. Warren rejected the offer, and demanded an unconditional defense from American. Initially, Hubble served as Warren's attorney in the damage suit. In June 1988 Hubble advised Warren that Warren had no duty to respond to communications from American; and, Warren and/or Hubble failed to respond to at least four letters from American reiterating its offer to provide a defense to Warren. In November 1988 Hubble withdrew from representation of Warren in the damage suit, leaving Warren without an attorney of record. American was not notified of the withdrawal until after a judgment had been entered against Warren. Six days after Hubble's withdrawal, Laster served a request for admissions on Warren, a copy of which was received by Hubble shortly thereafter. The request for admissions asked Warren to admit, in effect, that he was liable to Laster. Warren failed to respond to the request for admissions. Under Texas practice, the statements contained in the request for admissions were deemed to be admitted because of absence of timely denial. *See* Tex.R.Civ.P. 169. Based on the deemed admissions, Laster filed his motion for partial summary judgment asking that Warren be determined to be liable to Warren for all damages suffered by reason of the accident, which was granted in April 1989 because of the admissions. In October 1989 the judge of the court in which the damage suit was pending held a hearing to establish the amount to be awarded Laster against Warren. American was not notified of the hearing. Warren failed to attend. After the hearing, a judgment in favor of Laster against Warren in the amount of $2,985,124.81, plus court costs and post-judgment interest, was rendered on October 12, 1989.

Meanwhile, in August 1989, Laster and his attorney signed and delivered an instrument entitled "Release of Claims" by which, in exchange for payment to Laster and his wife of $23,000.00, Laster gave certain releases and made certain indemnity agreements. There is a legal dispute as to the effect of this instrument. It clearly resolved all claims of Laster against Inter County.

Although Hubble had withdrawn as Warren's attorney in the damage suit, he continued to represent Warren with regard to legal advice concerning American, as well as matters related to the damage suit. And the end of the sixth month after the October 12 judgment was rendered, Hubble

notified American of its existence and made demand for payment of the judgment. By document signed in March and April 1990 by Warren, Laster, Hubble, and Laster's attorney, Warren assigned to Laster two-thirds of the net amount of money, if any, recovered from American "concerning or related to" the insurance policy issued by American to Inter County or "concerning or relating to or arising out of" the damage suit.

Thereafter, Warren filed an action in a state district court against American by which he asserted claims identical to the claims Laster is making against American in the instant action. On July 12, 1991, the state court granted American's motion for summary judgment, and entered a take nothing judgment in favor of American against Warren. That judgment is now on appeal to the Court of Appeals for the Second Supreme Judicial District of Texas.

The action before the court was brought by Laster against American to recover on the causes of action assigned by Warren to Laster in the April 1990 document. All of Laster's causes of action are derivative through Warren. Laster seeks recovery of damages against American based on provisions of the excess policy and because of the conduct of American in failing to provide an unconditional defense to Warren in the damage suit.[1]

### Grounds of the Motion for Summary Judgment

American's motion for summary judgment is based on the following grounds:

(1) The judgment rendered in favor of American against Warren in the action Warren filed in state court against American has determined adversely to Laster, by claim preclusion or issue preclusion, the causes of action that Laster is asserting in this action.

(2) It has no liability under its insurance policy because of the failure of Warren to give it timely notice of the occurrence.

(3) It has no liability under its insurance policy because of a policy exclusion pertaining to existence of valid and collectible primary, or underlying, insurance.

(4) It has no liability under its insurance policy because there has not been compliance with a policy provision entitled "Loss Payable."

(5) It has no liability under its insurance policy because of the nature of the defense Warren conducted of himself in the damage suit.

(6) The provisions of the August 1990 "Release of Claims" document constitute a release of the claims that are being asserted by Laster in this action.

Brief in Support of Defendant's Motion for Summary Judgment ("Defendant's Brief") at 1–2.

As a general proposition, American asserts that it did not breach the insurance policy it issued to Inter County. Also, it gives as a reason why no coverage is available under its policy for the claim made by Laster that it had no duty to defend Warren under its policy. The court does not view the latter contention to be an ultimate ground of the motion for summary judgment, but, instead, to be anticipatory of contentions Laster might make in opposition to the motion. Finally, American asserts that Warren breached the policy because "[t]he settlement between the Lasters and Warren was unreasonable." Defendant's Brief at 2. This contention is subsumed in the (5) ground pertaining to adequacy of defense of the damages suit.

The court has determined that summary judgment should be granted on the basis of grounds (4), (5) and (6), as set forth above. But, under the existing record, the court is unwilling to rule in favor of American on grounds (1), (2) or (3).

---

1. The complaint seeks recovery from American of $2,985,124.81, the amount of the damage suit judgment, plus punitive damages in the amount of $8,000,000.00, plus prejudgment interest, plus treble damages under the Texas Deceptive Trade Practices—Consumer Protection Act, Tex.Bus. & Com.Code Ann. §§ 17.41–.63 (Vernon 1987 & Supp.1991), and Tex.Ins.Code Ann. art. 21.21 (Vernon 1981 & Supp.1991).

*The Claim Preclusion and Issue Preclusion Grounds*

■ For claim preclusion (*res judicata*) or issue preclusion (collateral estoppel) to apply, the party against whom it is urged, or his privy, must have been a party to the prior suit. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 & n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1978). American cannot prevail on either of these theories unless Warren, the plaintiff in the prior suit, was in privity with Laster, a nonparty to the prior suit. In *Benson & Ford, Inc. v. Wanda Petroleum Co.*, the Fifth Circuit explained:

A nonparty will be considered in privity, or sufficiently close to a party in the prior suit so as to justify preclusion, in three situations:

First, a nonparty who has succeeded to a party's interest in property is bound by any prior judgments against that party.... Second, a nonparty who controlled the original suit will be bound by the resulting judgment.... Third, federal courts will bind a nonparty whose interests were represented adequately by a party in the original suit....

833 F.2d 1172, 1174 (5th Cir.1987).

■ American argues that the First situation mentioned in *Benson & Ford, Inc.*, exists because the claims asserted by Laster were acquired by him through the April 1990 assignment. In doing so, American disregards the word "prior" as it is used in the *Benson & Ford, Inc.*, opinion. The judgment through which preclusion is sought was not rendered until after Laster succeeded to Warren's interest in the causes of action—it was not a prior judgment against Warren. There is no preclusion if the assignment takes place before the litigation that is urged as a basis for preclusion. *See Rhode Island Hosp. Trust*

*Nat'l Bank v. Ohio Casualty Ins. Co.*, 789 F.2d 74, 82 (1st Cir.1986); *Teleprompter Corp. v. Polinsky*, 447 F.Supp. 53, 56 n. 5 (S.D.N.Y.1977).

As to the second and third privity possibilities mentioned in *Benson & Ford, Inc.*, there is no suggestion in the summary judgment evidence that Laster controlled the prior suit, nor does the summary judgment record contain evidence from which the court can conclude that Laster's interests were represented adequately by Warren in the prior suit.

Therefore, privity has not been shown to exist in relation to the prior suit, with the result that the court cannot conclude that the judgment in that suit has a preclusive effect against Laster. The court is not directing its attention to other legal issues that would be presented as to the preclusive effect of the prior judgment if American had cleared the privity hurdle.

*The Untimely Notice Ground*

The notice provision in the basic coverage part[2] of the American policy reads as follows:

**D. Notice of Occurrence:** Whenever it appears that an occurrence is likely to involve this policy, written notice thereof shall be given to the company or any of its authorized agents as soon as practicable.

Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, the names and addresses of the injured and of available witnesses.

Defendant's Brief, Ex. "A", Policy Provisions—Part One at 3. There is nothing in the basic policy provisions that defines the consequences of nonperformance of this notice requirement.

**2.** American's insurance policy, which is exhibit "A" to Defendant's Brief, actually is two insurance policies combined in a single document. There is a basic policy, (consisting of the first 17 pages of the exhibit) which includes a Texas Amendatory Endorsement by which significant changes are made in the basic Insuring Agreements and Conditions. The second policy is the portion of exhibit "A" that is referred to as a Personal Catastrophe Liability Endorsement, which is reflected by the eighteenth and subsequent pages of exhibit "A" to Defendant's Brief. Its insuring agreements and other policy parts likewise are changed by a Texas Amendatory Endorsement, this one designated "for use with Personal Catastrophe Liability Endorsement."

In contrast, there is condition precedent language in the part of the policy contract that is designated "Personal Catastrophe Liability Endorsement", which extended the coverage of the policy to a named individual (presumably the owner of Inter County). The notice requirement in the endorsement reads as follows:

> **A. Notice of Occurrence.** Upon the happening of an occurrence reasonably likely to involve the company hereunder, written notice shall be given as soon as practicable to the company or any of its authorized agents. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances of the occurrence or injury, the names and addresses of the injured and of available witnesses.
>
> **B. Notice of Claim or Suit.** If claim is made or suit is brought against the insured relating to such an occurrence or injury, the insured shall immediately notify the company in writing and forward to the underlying insurer and to the company every demand, notice, summons or other process received by him or his representative.

Defendant's Brief, Ex. "A", Personal Catastrophe Liability Endorsement at 5. The endorsement expressly makes compliance with the other terms of the endorsement a condition precedent to the bringing of any action against the company:

> **E. Action Against the Company.** No action shall lie against the company with respect to any one occurrence unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of the endorsement, ...

*Id.* Thus, one might infer that American did not intend the notice requirement in the basic policy provisions to be a condition precedent. As noted in *Couch:*

> The fact that forfeiture is expressly imposed for failure to comply with some provisions of an insurance policy, but not

as to others, indicates an intention that no forfeiture shall attach to the latter. *Couch on Insurance,* § 15.96 at 464 (2nd ed. 1984).

■ Moreover, all the cases upon which American relies in support of its argument that breach of the notice provision relieves American of liability under the insurance policy without regard to whether it suffered prejudice as a result of the breach dealt with insurance policies in which performance of the notice requirement was stated in the policy to be a condition precedent to liability under the policy. *Weaver v. Hartford Accident & Indemnity Co.,* 570 S.W.2d 367, 369 (Tex.1978); *Dairyland County Mut. Ins. Co. of Texas v. Roman,* 498 S.W.2d 154, 156–57 (Tex.1973);[3] *Members Ins. Co. v. Cutaia,* 476 S.W.2d 278 (Tex.1972).

Even without resort to the principle noted by *Couch,* a proper application of Texas law to the insurance contract in question leads to the conclusion that the notice of occurrence provision contained in the basic coverage part of the policy is not a condition precedent and that prejudice must be proved by American in order to avoid liability under its policy because of breach of the condition. *Cf. Maryland Casualty Co. v. W.C. Robertson & Co.,* in which the court said:

> Again, the policy in the case, while it does provide that immediate notice of any accident and of any suit resulting therefrom, must be forwarded to the home office of the insurance company, or to its authorized representative, does not expressly stipulate that a failure shall work a forfeiture, and the delay, if any, shown, should constitute no defense to this action, since it appears, we think, that the plaintiff in error received notice in time to make a full investigation, and it does not appear that it has suffered any loss or injury by reason of the delay.

·   ·   ·   ·   ·

---

3. The opinion in *Dairyland County Mut. Ins. Co. of Texas* does not disclose that the policy contained condition precedent language, but the court judicially knows that the standard auto-

mobile policy, the form of which was prescribed by law, in use in Texas in 1970 and for a number of years prior thereto contained such a provision.

194 S.W. 1140, 1143 (Tex.Civ.App.—Dallas 1917, no writ). *Cf. also Hall's Aero Spraying v. Underwriters at Lloyd's, London:*

> The law does not prevent parties from providing by contract that the validity of an insurance policy depends upon the strict compliance with a policy provision. "But, unless clearly demanded by the established rules governing the construction of written agreements, such an interpretation ought to be avoided." *Moulor v. American Life Insurance Co.,* 111 U.S. 335, 4 S.Ct. 466, 469, 28 L.Ed. 447.

274 F.2d 527, 529–30 (5th Cir.1960). If breach of a notice provision in the policy cannot work a forfeiture of coverage absent an express forfeiture provision in the policy, for the same reason noncompliance with such a provision, absent policy language expressly so providing, cannot be deemed to be nonperformance of a condition precedent. Proof of prejudice to the insurer as a result of the breach, or noncompliance, is required in either event for coverage to be avoided.

█ The court is not persuaded that there is no issue of fact as to whether the timing of the notice given to American caused it to be prejudiced. Furthermore, the court is not satisfied from the summary judgment record that timely notice was not given by Warren after he realized that the September 1983 accident was likely to involve the American policy. A broad range of factors must be considered in determining the timeliness of notice. *See, e.g., Dairyland County Mut. Ins. Co. of Texas v. Roman,* 498 S.W.2d 154, 158 (Tex.1973); *Broussard v. Lumbermen's Mut. Casualty Co.,* 582 S.W.2d 261, 262–63 (Tex.Civ. App.—Beaumont 1979, no writ).

A conclusion that there is no genuine issue of fact as to the untimely notice ground is not supported by the summary judgment record.

*The Ground Based on the Policy Exclusion Pertaining to Existence of Valid and Collectible Primary, or Underlying Insurance*

█ The exclusion, added by endorsement, upon which American relies reads as follows:

> It is agreed that this policy shall not apply to liability arising out of the ownership, maintenance, operation, use, loading or unloading of any automobile unless such liability is covered by valid and collectible underlying insurance with Limits of Liability at least equal to those described in Schedule A for Comprehensive Automobile Liability insurance.

Defendant's Brief, Ex. "A", Automobile Liability Coverage—Following Form.

American contends that once Transit became insolvent and, consequently, its policy no longer was collectible underlying insurance, this exclusionary language caused the policy not to apply to liability arising thereafter out of the accident in question. This proposed interpretation of the exclusionary language is somewhat strained in favor of American. In Texas, insurance policies are governed by a special rule of construction, which the Texas Supreme Court explained in *Continental Casualty Co. v. Warren:*

> But for the fact that *insurance policies are governed by the special rule of construction,* which is a familiar part of our jurisprudence, we might, indeed, hold either that the interpretation against liability of the insurer should prevail or that, the policy being ambiguous, there is a fact issue as to what was intended. Yet the rule, of course, applies, and under it *the insurer may not escape liability merely because his or its interpretation should appear to us a more likely reflection of the intent of the parties than the interpretation urged by the insured. The latter has to be no more than one which is not itself unreasonable.* Lloyds Casualty Insurer v. McCrary, 149 Tex. 172, 179, 229 S.W.2d 605, 609. A related or subsidiary rule is "that exceptions and *words of limitation will be strictly construed against the insurer."* Providence Washington Ins. Co. v. Proffitt, Tex., [150 Tex. 207] 239 S.W.2d 379, 381.

254 S.W.2d 762, 763 (Tex.1953) (emphasis added). Also, the Texas Supreme Court

has decreed that a literal interpretation of policy language must be rejected if it defeats the insuring objective. *See Commonwealth Bonding & Casualty Ins. Co. v. Bryant*, 113 Tex. 21, 240 S.W. 893, 894 (1922).

Laster contends that the exclusion applies only if there is no valid and collectible liability insurance at the time of the accident that gives rise to the claims. This is not an unreasonable interpretation to be given to the language of the exclusion. However, the court is of the belief that the meaning to be given to the language of the exclusion differs from the contention of either party. At the bottom of the page on which the exclusion is contained the statement is made: "**Purpose:** To place all automobile coverage on a following form basis." Defendant's Brief, Ex. "A", Automobile Liability Coverage—Following Form. The term "following form" has a generally recognized meaning. In *Home Ins. Co. v. American Home Products Corp.*, 902 F.2d 1111, 1113 (2nd Cir.1990), the court noted that a "following form" insurance agreement is one that subjects the excess insurer to the "terms, conditions and exclusions" of the underlying policy. In *Ford Motor Co. v. Northbrook Ins. Co.*, 838 F.2d 829, 831 (6th Cir.1988), "following form policies" were described as policies that "followed the insuring agreements, conditions and exclusions" of the underlying policy. To the same effect are the holdings in *Thornton v. St. Paul Property & Casualty Insurance Co.*, 741 F.Supp. 1141, 1143 (D.Del.1990); *Industrial Risk Ins. v. New Orleans Public Serv.*, 666 F.Supp. 874, 876

(E.D.La.1987); and *City of Northglen v. Chevron U.S.A., Inc.*, 634 F.Supp. 217, 221 (D.Colo.1986).

The court hesitates to speculate as to the exact effect intended to be given to American's exclusionary endorsement, but feels secure in the conclusion the court has reached that the exclusion cannot be given the effect of denying excess coverage to an insured because of post-occurrence insolvency of the primary insurer.

### *The "Loss Payable" Ground*

■ The "Loss Payable" ground of American's motion is based on the first paragraph of a condition entitled "Loss Payable" that is contained in the basic policy provisions, which provides:

**G. Loss Payable:** The company's liability under this policy with respect to any occurrence shall not attach until the amount of the applicable underlying limit has been paid by or on behalf of the insured, or the amount of the retained limit has been paid by the insured on account of such occurrence.

Defendant's Brief, Ex. "A", Policy Provisions–Part One at 3.

American's contention is that it has no liability under the policy with respect to the accident in question unless and until there has been *either* payment by or on behalf of the insured of $1,000,000.00, which is the amount of the underlying limit of liability of the Transit policy, *or* payment by the insured of $25,000.00, which is the retained limit specified in the basic part of American's policy.[4]

---

4. The court notes that the coverage language of the Texas Amendatory Endorsement to the basic coverage part says that American's payment obligation is tied to the "retained limit" rather than to the "amount of the applicable underlying limit:"

I. COVERAGE: The company will indemnify the insured or pay to the insured the ultimate net loss *in excess of the retained limit* ... Defendant's Brief, ex. "A", Texas Amendatory Endorsement (emphasis added). When this coverage language was called to the attention of American's counsel at a recently held pretrial conference, counsel responded that the language was the result of a printer's error. But, there has been no request for reformation of the

policy, nor has there been any suggestion that a request for reformation would be successful if made. Thus, the language of the endorsement suggests that American's indemnification or payment obligation, as between American and its insured, starts above the "retained limit." However, when this coverage language is considered with the "Other Insurance" condition of the basic policy conditions (Defendant's Brief, ex. "A", Policy Provisions–Part One at 3), the indication is that, if there is valid and collectible primary insurance available to the insured, American's coverage will be excess over the primary coverage, whatever its limit might be.

The apparent discrepancy between the "coverage" language of the Texas Amendatory Endorsement and the language of the "Loss Pay-

When the coverage language, as contained in the Texas Amendatory Endorsement, is read together with the first paragraph of the Loss Payable condition, one sees that the condition is a condition precedent to the effect that American will not have liability under the policy with respect to any occurrence until $25,000.00 has been paid by Warren on account of the occurrence. There is no dispute between the parties that Warren has not made such a payment. Defendant's Brief, Ex. "BB" at 3.

The requirement that such a payment be made by the insured before American can become liable is an acceptable and reasonable condition precedent. It has as its objective the prevention of an arrangement by which the insured would seek to cause liability to be imposed on the insurance company for an amount in excess of the retained limit without first experiencing any financial detriment himself. This is precisely the kind of arrangement the insurer contends Warren, Laster and their counsel have made in the instant case. The Loss Payable provision upon which American relies causes it not to be liable with respect to any liability purportedly imposed on Warren in favor of Laster pursuant to such an arrangement.

If the policy did not contain such a condition, American could be subjected to fraudulent and collusive transactions of a kind to which an excess insurer becomes particularly vulnerable when the primary insurer refuses, or is unable, to perform its obligation to protect the insured by providing him an appropriate investigation and defense related to claims arising from a covered occurrence. As is discussed under the next heading of this memorandum opinion, American had no duty to defend Warren in the damage suit, though it had the option to do so. If an excess insurer elects not to provide a defense, and if the primary carrier fails or refuses to defend the insured, there is a temptation on the part of the insured to join with the injured party in a collusive arrangement that would give the insured immunity from any financial exposure while at the same time providing the injured party an opportunity to seek collection under the excess insurance policy. When there is a requirement, such as the one contained in American's policy, that the excess insurer cannot be liable unless the insured has first made a significant payment of his own, the risk that the insured and the injured party will take unfair advantage of the excess insurer is greatly reduced.

The court has concluded that the portion of the Loss Payable condition upon which American relies provides a ground for grant of American's motion for summary judgment.

### The Ground of American's Motion Based on the Nature of the Defense Warren Conducted in the Damage Suit

■ Contentions of the parties relative to the handling of Warren's defense present a threshold question of whether American had an obligation to provide a defense to Warren in the damage suit. Laster contends, by way of avoidance of certain of the grounds of American's motion for summary judgment, that American is prevented from urging those grounds because of having breached the contract itself by failing to perform an obligation it had to provide a defense to Warren in the damage suit. The court has concluded that Laster is wrong. No defense obligation is imposed on American by the policy.

Before the basic policy coverage language was changed by the Texas Amendatory Endorsement, the policy did impose a defense obligation on American with re-

able" condition undoubtedly arises, at least in part, from the fact that the coverage language in the basic coverage part, which was replaced by the language in the endorsement, tied American's payment obligation to "ultimate net loss in excess of the underlying limit or retained limit...." Defendant's Brief, ex. "A", Policy Provisions–Part One at 1.

However, this discrepancy is not relevant to the viability of the "Loss Payable" ground of defendant's motion inasmuch as there has been no payment of any amount by Warren or on his behalf. Defendant's Brief, ex. "BB" at 3.

spect to any occurrence not covered by underlying insurance, but covered by the American policy, by providing:

**II. Defense Settlement:** With respect to any occurrence not covered by underlying insurance, but covered by the terms and conditions of the policy, the company *shall*:

(a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

Defendant's Brief, Ex. "A", Policy Provision–Part One at 1 (emphasis added). However, the Texas Amendatory Endorsement made a drastic change in this provision by substituting the word "may" for the word "shall", saying:

**II. DEFENSE SETTLEMENT:** With respect *to any occurrence not covered by the underlying policies listed in Schedule A hereof or any other underlying insurance collectible by the insured,* but covered by the terms and conditions of this policy except for the amount of the retained limit specified in Item 3(C) of the declarations, the company *may*:

(a) *defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;*

*Id.,* Texas Amendatory Endorsement (emphasis added). The fact that the insurance policy, as endorsed, gave American the option, rather than to impose on it the obligation, to defend is confirmed by the change the same endorsement accomplished in condition J of the basic insurance coverage provisions. As originally worded, condition J said, in pertinent part:

**J. Underlying Insurance:** If underlying insurance is exhausted by any occurrence, the company *shall* be obligated to

assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another insurer.

*Id.,* Policy Provisions–Part One at 3 (emphasis added). As reworded by the endorsement, condition J converted the defense obligation to a option to defend by saying:

**J. UNDERLYING INSURANCE:** If underlying insurance is exhausted by any occurrence, the company *may* assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

*Id.,* Texas Amendatory Endorsement (emphasis added).

Also against Laster's contention that American had an obligation to defend Warren is the change made by the Texas Amendatory Endorsement in the first paragraph of condition E of the basic policy provisions. Pre-endorsement, the first paragraph of condition E read:

**E. Assistance and Cooperation of the Insured:** Except as provided in Insuring Agreement II (Defense Settlement) or in Condition J (Underlying Insurance), the company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured.

*Id.,* Policy Provisions–Part One at 3. The endorsement changed this to read:

**E. ASSISTANCE AND COOPERATION OF THE INSURED:** The company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured.

*Id.,* Texas Amendatory Endorsement.

Finally, the second paragraph of condition E confirms that association by Ameri-

can in the insured's defense is a right, instead of a duty, and that American becomes obligated in reference to the matter of defense only if it chooses to exercise that right:

> The company shall have the right and shall be given the opportunity to associate with the insured or its underlying insurers, or both, in the defense and control of any claim, suit or proceeding which involves or appears reasonably likely to involve the company and *in which event* the insured, such insurers and the company shall cooperate in all things in defense of such claim, suit or proceeding.

*Id.*, Policy Provisions–Part One at 3 (emphasis added).

When construing an insurance policy, the court must give effect to the plain language of the contract when the intent of the parties can be discerned from that language. *See Blaylock v. American Guarantee Bank*, 632 S.W.2d 719, 721 (Tex. 1982). The plain language of American's policy, as amended by the endorsement, is that American had no obligation to defend Warren in the damage suit, though it had the option to do so. *Cf. American Motorists Ins. Co. v. Trane Co.*, 544 F.Supp. 669, 698–99 (S.D.Wis.1982). Therefore, American did not breach any obligation it had under the policy when it offered to provide a defense to Warren subject to certain reservations. It had no obligation to offer a defense in the first place.

■ Insolvency of the primary insurer does not impose on the excess insurer an obligation to defend if it does not otherwise have such an obligation under the policy. *See Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 278–79 (5th Cir.1989) (in which the court held that insolvency of the primary insurer did not impose a defense obligation on the excess insurer even though the excess policy provided that "[t]he Company will defend any claim or suit against the insured seeking damages on account of injury or damage to which this policy applies and which no underlying insurer is obligated to defend …")

The issue that next presents itself is the extent, if any, to which Warren had an obligation to defend himself in the damage suit, bearing in mind that the primary insurer was not providing a defense because of its insolvency and Warren had rejected American's offer to provide him a defense.

■ If American exercises its option not to provide a defense, or is rebuffed in an offer to defend, and if the primary insurer does not or cannot provide a defense, American is at the mercy of the insured to see that proper steps are taken in the defense of a legal action brought against the insured to establish the existence and amount of his legal liability, if any. Implicit in an excess insurance contract of this kind is an obligation on the part of the insured to take reasonable steps to avoid legal liability or to minimize the amount of his legal liability. He cannot assume liability for which the excess carrier will be liable unless the excess carrier joins in the agreement. By the same token, he cannot, without the knowledge and consent of the excess insurer, engage in conduct that is intentionally calculated to allow, or cause, legal liability to be created for which the excess carrier would be liable under the policy.[5] With that in mind, a chronological analysis of the undisputed summary judgment evidence related to Warren's defense conduct is appropriate:

---

**5.** Even in those cases where the insurer has wrongfully refused to defend, the insured is unable to recover based on liability thereafter imposed on the insured unless he has conducted a reasonable defense. *Cf. Britt v. Cambridge Mutual Fire Insurance Co.*, 717 S.W.2d 476, 483 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.) (in which the court declined to apply the doctrine of collateral estoppel against the insurer in reference to a damage suit judgment against the insured because there was evidence "sufficient for the trial court to find that [the insured] failed to conduct a reasonable defense and that the parties colluded to defraud [the insurer]"); *Fidelity & Casualty Co. of New York v. Gault*, 196 F.2d 329 (5th Cir.1952) (Even though the insured had wrongfully refused to defend the insured in the damage suit, the failure of the insured to properly defend the suit and to attempt to reduce his damages was given as a reason why the insurer would not have an obligation to pay the excess part of a judgment rendered in the damage suit.)

■ After having been served on December 6, 1986, with process in the damage suit, Warren, acting through Hubble, by letter of February 27, 1987, notified American for the first time of the September 1983 accident and pendency of the damage suit. Defendant's Brief, Ex. "K". According to the letter, Warren had no personal knowledge of the accident until he was served with process. Hubble said that he had "entered an appearance in the suit on behalf of Mr. Warren in order to protect him from entry of default judgment," and requested that American arrange to have an attorney "substitute into this case as the attorney of record for Steve Warren." American responded by letter of October 29, 1987, and again by letter of December 14, 1987, advising of its investigation of the matter under "reservation of rights." *Id.,* Ex. "L"; Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment, Ex. "F". By letter of December 22, 1987, Mr. Hubble told American that "Mr. Warren is requesting an unqualified defense in this suit on his behalf and will not accept a defense under reservation of rights." Defendant's Brief, Ex. "M" at 1. Hubble made known the position of Warren relative to the merits of the damage suit, saying:

Clearly, it appears to me that this case is defensible and that the most economical resolution of the claim on the part of your company would be to assume that meritorious defense.

*Id.* at 2. On March 17, 1988, American wrote Hubble, offering to defend Warren but stating that it was doing so on the basis of reserving its rights to assert certain contentions relative to its payment obligations under the policy. *Id.,* Ex. "N". Hubble's response came by letter of April 25, 1988, in which he said that Warren would accept a defense provided by American only on condition that American pay Hubble $1,500.00 as attorney's fees for his defense of Warren to that point in time and the condition that Warren would not waive any rights possessed by him under the policy or under the laws of the State of Texas. *Id.,* Ex. "O". This letter was concluded with the statement that:

If you will not accept the defense of Mr. Warren on these terms and conditions, please let me know and I will continue to conduct the defense of Mr. Warren in this case without further status reports to your office.

American followed up with letters dated June 29, 1988, and August 9, 1988, to Hubble, offering to provide Warren a gratuitous defense to the damage suit, "only with the agreement that Mr. Warren will take no further action to seek indemnity from Great American under the $1,000,000.00 underlying limit of liability provided by Transit Casualty."[6] *Id.,* Exs. "P" and "Q". Those letters went unanswered. Pretrial Order at 5.

Without any notification to American, Hubble withdrew from Warren's representation in the lawsuit by motion filed in October 1988 and order signed in November 1988. *Id.* at 6; Defendant's Brief, Exs. "E" and "F". Until then, Hubble had conducted no formal discovery, other than to review medical records. Pretrial Order at 7. The last word American had received on the subject of Warren's representation in the damage suit was Hubble's statement in the April 25, 1988, letter that he would "continue to conduct the defense of Mr. Warren in this case without further status report to your office." *Id.,* Ex. "O". Six days after Hubble's withdrawal, Laster's attorney sent a request for admissions to Warren, asking, in effect, that Warren admit liability to Laster. Pretrial Order at 6. Hubble, who continued to represent Warren outside the suit itself, received the request less than a week after Warren did. *Id.* at 6 & 8. Warren admitted liability by making no response to the request. *Id.* at 6–7. Discussions between Hubble and Laster's attorney, Wells, concerning a po-

---

**6.** As noted at an earlier point in this memorandum, American was in error in its insistence that it would not be obligated to pay any part of the first $1,000,000.00 in damages. However, inasmuch as this position was taken as to a reservation of rights related to a tender of defense that American had no obligation to make, it has no relevance to the outcome of this action.

tential bad faith claim against American apparently was a factor in the decisions of Hubble to withdraw from litigation representation of Warren and to allow the statements in the request to be deemed admitted. Hubble testified on deposition:

Q. Okay. When did you first discuss the whole concept of insurance coverage with Wells [counsel for the Laster]?

A. Shortly before or shortly after I [withdrew] in this case, I met with Mr. Wells and informed him that I had some correspondence with Great American that I thought created a potential bad faith claim and a potential Allstate versus Kelly type arrangement.[7]

Q. And that didn't—

A. And that was a very short discussion I had with Mr. Wells. I told him that if and when he gets a judgment against Steve Warren, to get a hold of me. And we didn't have another discussion until approximately March of 1990.

Q. Did that have any bearing whatsoever upon your failure to have—or ensure that admissions and responses to admissions be filed?

A. It had some bearing on the requests for admission.

Q. Well, what bearing did it have on the requests for admission?

A. Due to my knowledge of the correspondence I'd had with Great American, I had less concern about a judgment being entered against my client than I would in other circumstances.

Defendant's Brief, Ex. "AA" at 156–57. Warren's admission of liability formed the ground of a motion for partial summary judgment Laster filed in the damage suit in February 1989. Defendant's Brief, Ex. "G". The partial summary judgment was granted as to liability in April 1989. It was based on the deemed admissions. Pretrial order at 6. Warren failed to attend the hearing on the motion, which was held April 13, 1989. Defendant's Brief, Ex.

"H". Although both Hubble and Warren knew of that hearing, neither notified American. *Id.*, Ex. "X" at 4–5.

By letter of July 13, 1989, to Warren, American again offered to defend Warren in the damage suit, subject to the same reservation it previously had expressed. *Id.*, Ex. "R" at 2. Hubble responded by letter dated August 1, 1989, informing the insurance company for the first time of his withdrawal from representation of Warren in the damage suit, Warren's receipt of, and failure to respond to, the request for admissions, and the fact that the partial summary judgment had been granted because of the failure to respond to the request. *Id.*, Ex. "S". Among the statements made by Hubble in this letter are the following:

At that time [June 29, 1988], I advised Mr. Warren that, in my opinion, he had no further duty to correspond or communicate with your company, that your company had breached its obligation to defend him in this matter, and that your company would be bound to pay any judgment rendered against him in the case in the 153rd Judicial District Court of Tarrant County, Texas. Further, at that time, as Mr. Warren was unable to pay my attorney's fees in what appeared to be certain protracted and expensive litigation, I withdrew from representation of Mr. Warren in that cause. I told him to do the best that he could do to defend himself, and that in the event an unfavorable judgment was rendered against him, to get back with me so that we could work something out with regard to satisfaction of that judgment. That course of action was the only feasible course of action to take under the circumstances.

It now appears that Mr. Warren has had a judgment entered against him because he failed to respond to request for admissions within thirty (30) days, as required by the Texas Rules of Civil Procedure. Of course, it is not uncommon for me to find in my practice that citizens of

---

**7.** This has reference to the theories of extracontractual liability that were approved in *All-* *state Ins. Co. v. Kelly,* 680 S.W.2d 595 (Tex. App.—Tyler 1984, writ ref'd n.r.e.).

Texas who are not trained in the law are not familiar with the Texas Rules of Civil Procedure or, specifically, the consequences of failing to respond to request for admissions. In all probability, Mr. Warren would have timely responded to these request for admissions had he been represented by legal counsel. Due to your company's failure to provide him with a defense, Mr. Warren was not represented with legal counsel, and now has a judgment against him. As I indicated to Mr. Warren, as I previously indicated to your company by my previous correspondence, and as I now indicate to you, it is my opinion that your company is bound by everything that takes place in the case in the 153rd Judicial District Court, including the entry of an adverse judgment against Mr. Warren due to your failure to provide him with legal counsel.

*Id.* at 4.

American again offered by October 17, 1989, letter to Warren to undertake his defense in the damage suit, subject to the same conditions it previously had outlined. *Id.*, Ex. 10. In this letter, American alerted Warren to his defense obligations, saying:

Your failure to cooperate and adequately defend yourself has greatly hurt your position in this case. If you insist on providing your own defense (and rejecting our offer of a defense), you must do so in a reasonable and prudent manner. Your failure to do so may seriously endanger any coverage which might be available under the subject policy with Intercounty Concrete.

*Id.*

In the meantime, before American's October 17, 1989, letter, the hearing on damages to be awarded to Laster was held October 5, 1989. It resulted in the signing on October 12, 1989, of a $2,985,124.81 judgment in favor of Laster against Warren. *Id.*, Exs. "I" and "J". Warren was

aware of the hearing, but he did not attend and did not notify American that it was to be held. *Id.*, Ex. "X" at 10–11, Ex. "BB" at 2; Pretrial Order at 8.

Although having been alerted by the October 17 letter to the urgency in cooperating with American, Warren and Hubble chose not to disclose to American by a response to the October 17 letter that a judgment of almost $3,000,000.00 had been entered a few days earlier in favor of Laster against Warren in the damage suit. By letter of March 15, 1990, American again solicited cooperation from Warren, and again cautioned him that:

Your failure to cooperate and adequately defend yourself has greatly hurt your position in this case. If you insist on providing your own defense (and rejecting our offer of a defense), you must do so in a reasonable and prudent manner. Your failure to do so may seriously endanger any coverage which may be available under the subject policy with Intercounty Concrete.

Defendant's Brief, Ex. "U" at 2. Still, Warren's cooperation was lacking because no response was made to the March 15 letter until six months after the final judgment was rendered against Warren, when, by letter of April 10, 1990, Hubble informed American for the first time that the judgment had been rendered and that litigation would be instituted against American for its conduct "in the handling or mishandling of this claim." *Id.*, Ex. "V" at 3. By the time the April 10 letter was sent, Warren, Hubble, Laster and Wells had signed an agreement that divided any claims Warren might have against American related to the $2,985,124.81 judgment two-thirds to Laster and one-third to Warren. *Id.*, Ex. "CC" at 2.

The timing of the April 10, 1990, letter was such that its mailing coincided with expiration of the time limit for the last remaining right of appeal from the October 12, 1989, judgment.[8] Interestingly, Hubble

**8.** Under Texas law, an appeal must be perfected from a final trial court judgment by the filing of notice of appeal within thirty days after date of judgment (assuming there has been no motion

for new trial or the like) except in those cases when the appealing party has not participated in the trial of the action. Tex.R.App.P. 41. A party who does not participate in the trial can

advised in his April 10 letter that, after all, he represents Warren and wants all future correspondence and communication directed to his office and not to Warren. The fact is that throughout Hubble continued to advise plaintiff as to various aspects of the damage suit as well as *all* issues related to American, including coverage. *Id.*, Ex. "AA" at 8–9, 25–26; ex, "Z" at 63, 94. Hubble testified on deposition:

> Q. But did you provide him [Warren] with legal advice in any way, directly or indirectly, with regard to this lawsuit after you withdrew from your appearance?
>
> A. In the underlying lawsuit?
>
> Q. Yes.
>
> A. Yes, I did.
>
> Q. So were you or were you not his lawyer with regard to this lawsuit after November 11th, 1988?
>
> A. There was a continuing attorney/client relationship.

*Id.*, Ex. "AA" at 9.

A more glaring case of lack of cooperation by an insured and of calculated disregard of an excess insurer's rights would be difficult to find. Improper collusive conduct on the part of Warren and his counsel, to the detriment of American, is strongly indicated by the summary judgment record. Up to the point in time when Hubble withdrew from Warren's representation in the damage suit there was, at least, a serious neglect of Warren's defense as evidenced by the failure of Hubble to serve interrogatories or engage in the other kinds of formal discovery calculated to cause a case to be prepared for trial. Starting no later than Hubble's withdrawal from the damage suit representation of Warren, the decision seems to have been made to engage in conduct designed to "set up" American for bad faith, etc., claims to the mutual benefit of Laster and Warren

and their respective attorneys. From that point forward the activity of, and on behalf of, Warren apparently was directed against the interests of American rather than, as it should have been, to a furtherance of the common interests of Warren and American. However, the court does not need to reach a decision on the subject of collusion in order to conclude, as the court does, that the summary judgment record shows that Warren's conduct has been such as to cause American not to have liability for the judgment taken against him by Laster.[9]

Warren's defense conduct provides another, independent ground for grant of American's motion.

### The Ground Related to the August 1990 Release Document

■ A copy of the release document upon which American relies as a ground of its motion is exhibit "J" to Defendant's Brief. It is signed by Laster and Sheila Laster, apparently Laster's wife. The document contains release and indemnification agreements given by the Lasters in exchange for payment to them and The Travelers Insurance Company of $23,000.00. The specific part of the document urged by American as a reason for grant of summary judgment is paragraph 13b, on pages 7–8, which reads:

13b.

*For the same consideration, Larry Laster* and Sheila Laster *agree to defend, indemnify, and hold harmless* Great American Insurance Companies, *American National Fire Insurance Company,* their officers, directors, employees, and agents, *from and against any claim, suit, or judgment which may now or hereafter be asserted, brought or filed by Steven Warren,* a/k/a Steve Warn, *against* Inter County,

seek review by a writ of error, and has six months after the final judgment is rendered within which to do so. Tex.R.App.P. 45; 4 Tex. Jur.3d, *Appellate Review* § 11 & § 193 (1980).

**9.** If summary judgment were not appropriate in this case, and the case were to have to be tried on its merits, the issue of improper conduct of

the insured and his counsel undoubtedly would be presented for determination. *Cf. Sargent v. Johnson,* 551 F.2d 221, 232 (8th Cir.1977); *Manning v. State Farm Mut. Auto. Ins. Co.,* 235 F.Supp. 615, 618 (W.D.N.C.1964); *Britt v. Cambridge Mut. Fire Ins. Co.,* 717 S.W.2d 476, 483 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.).

its officers and directors, and/or Great American Insurance Companies and *American National Fire Insurance Company,* their officers, directors, employees, and agents, *which is based upon, arises from, or grows out of the incident in question.* However, the agreement in this paragraph 13b to defend, indemnify and hold harmless applies only to the extent of any coverage provided to Inter County for the liability which may accrue to or be imposed upon Inter County for the acts of its agents or employees, on account of injuries and damages of every kind whatsoever arising from the incident giving rise to this lawsuit, including: (1) all acts or omissions of Inter County, its officers, and directors; and (2) all acts or omissions of any employees of Inter County.

While this Release fully and finally compromises and settles the dispute between Larry Laster, Sheila Laster, and Inter County Concrete, Inc., it does not in any way resolve the dispute between the Lasters and Steve Warren, individually and personally.

(emphasis added).

Inasmuch as this action is based on claims derivative through Warren, it is the equivalent of an action by Warren against American. The literal wording of the indemnification and hold harmless agreement causes Laster to be obligated to indemnify and hold harmless American with respect to the claims he, as Warren's assignee, is asserting against American in this action. Avoidance of circuity of action is a commendable goal. *Cf. Palestine Contractors, Inc. v. Perkins,* 386 S.W.2d 764, 768 (Tex.1964) (in which the Texas Supreme Court adopted a rule that prevented circuity of action where an injured party has agreed to indemnify a settling tortfeasor who is thereafter named a contribution

third-party defendant in a suit by the injured party against a nonsettling co-tortfeasor—if the nonsettling co-tortfeasor in such an action were to establish entitlement to contribution from the settling tortfeasor, the injured party's recovery from the nonsettling co-tortfeasor would be reduced by an appropriate amount to eliminate circuity of payment or recovery).[10] In order to avoid a circuity of payment or recovery in this action, the indemnification and hold harmless language in question will constitute a defense to any action brought by Warren (or by Laster, claiming derivatively through Warren) against American.

Initially, the court was concerned with the part of paragraph 13b that says:

[T]he agreement in this paragraph 13b to defend, indemnify and hold harmless applies only to the extent of any coverage provided to Inter County for the liability which may accrue to or be imposed upon Inter County …

However, the court has concluded that a proper reading of this language is that it defines the dollar amount of the indemnification and hold harmless obligation rather than to limit the effect of the obligation to liability that might be imposed on Inter County.[11]

The court concludes that this ground of American's motion likewise has merit.

## ORDER

The court, therefore, ORDERS that:

(a) American's motion for summary judgment be, and is hereby, granted;

(b) Laster be, and is hereby, denied any recovery from American, and Laster's claims and causes of action against American be, and are hereby, dismissed; and

---

**10.** The contribution/indemnity principles of the *Palestine Contractors, Inc.* case were impaired by holdings of the Texas Supreme Court in *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984), but the principle that circuity of action is to be avoided where possible remains unimpaired.

**11.** The court recognizes that the extra-contractual relief sought by Laster, through assignment from Warren, in this action could theoretically cause a judgment to be rendered in this action in excess of the coverage amount contemplated by paragraph 13b. Were it not for the fact that the other grounds upon which the court is granting American's motion are fully dispositive, the court would explore this issue further.

(c) American recover costs of court incurred by it from Laster.